# United States Court of Appeals
## For the Eighth Circuit

_____

No. 11-1877

_____

Matthew Livers

*Plaintiff - Appellee*

v.

Earl Schenck, Cass County Sheriff's Investigator;
William Lambert, Nebraska State Patrol Investigator;
Charles O'Callaghan, Nebraska State Patrol Investigator;
Sandra Weyers, Cass County Sheriff's Sergeant;
County of Cass, Nebraska;
David Kofoed, Commander of the Douglas County
Sheriff's Office Crime Scene Investigation Division

*Defendant*s

Tim Dunning, Sheriff of Douglas County

*Defendant - Appellant*

County of Douglas, Nebraska

*Defendant*

_____

No. 11-1879
_____

Matthew Livers

*Plaintiff - Appellee*

v.

Earl Schenck, Cass County Sheriff's Investigator

*Defendant - Appellant*

William Lambert, Nebraska State Patrol Investigator;
Charles O'Callaghan, Nebraska State Patrol Investigator

*Defendant*s

Sandra Weyers, Cass County Sheriff's Sergeant

*Defendant - Appellant*

County of Cass, Nebraska;
David Kofoed, Commander of the Douglas County
Sheriff's Office Crime Scene Investigation Division;
Tim Dunning, Sheriff of Douglas County;
County of Douglas, Nebraska

*Defendant*s

_____

No. 11-1880
_____

Matthew Livers

*Plaintiff - Appellee*

v.

Earl Schenck, Cass County Sheriff's Investigator

*Defendant*

William Lambert, Nebraska State Patrol Investigator;
Charles O'Callaghan, Nebraska State Patrol Investigator

*Defendants - Appellants*

Sandra Weyers, Cass County Sheriff's Sergeant;
County of Cass, Nebraska;
David Kofoed, Commander of the Douglas County
Sheriff's Office Crime Scene Investigation Division;
Tim Dunning, Sheriff of Douglas County;
County of Douglas, Nebraska

*Defendant*s

_____

No. 11-1917
_____

Nicholas Sampson

*Plaintiff - Appellee*

v.

Investigator William Lambert, in his official and individual capacities;
Investigator Charles O'Callaghan, in his official and individual capacities

*Defendant*s

Sergeant Sandy Weyers, in her official and individual capacities

*Defendant - Appellant*

Cass County Sheriff's Office, a Nebraska political subdivision;
Does 1-8, in their official and individual capacities

*Defendant*s

Investigator Earl Schenck

*Defendant - Appellant*

Douglas County Sheriff's Office;
David W. Kofoed, in his official and individual capacities

*Defendant*s

-4-

_____

No. 11-1918
_____

Nicholas Sampson

*Plaintiff - Appellee*

v.

Investigator William Lambert, in his official and individual capacities;
Investigator Charles O'Callaghan, in his official and individual capacities

*Defendants - Appellants*

Sergeant Sandy Weyers, in her official and individual capacities;
Cass County Sheriff's Office, a Nebraska political subdivision;
Does 1-8, in their official and individual capacities;
Investigator Earl Schenck;
Douglas County Sheriff's Office;
David W. Kofoed, in his official and individual capacities

*Defendant*s
_____

Appeals from United States District Court
for the District of Nebraska - Omaha
_____

Submitted: February 16, 2012
Filed: November 8, 2012
_____

Before RILEY, Chief Judge, WOLLMAN and SMITH, Circuit Judges.
_____

RILEY, Chief Judge.

Cousins Matthew Livers and Nicholas Sampson were arrested and jailed awaiting trial for the murders of Sharmon and Wayne Stock after Livers confessed to the murders and implicated Sampson as an accomplice. Later, the charges against Livers and Sampson were dropped. They separately sued individual officials and municipal entities involved in the investigation, citing 42 U.S.C. § 1983 and alleging numerous constitutional violations. Several of the individual defendants appeal from the district court's denials of their motions for summary judgment based on qualified immunity. The appeals have been consolidated. We affirm in part, reverse in part, and remand for further proceedings.

## I.   BACKGROUND
### A.   Factual Background[1]
The Stocks were brutally murdered by close-range gunshots. The murders occurred in the Stocks' home near Murdock, Nebraska, before dawn on April 17, 2006. Members of the Cass County Sheriff's Office (CCSO), Nebraska State Patrol (NSP), and Douglas County Crime Scene Investigation Unit (DCCSI), a division of the Douglas County Sheriff's Office (DCSO), participated in the Stock homicide investigation.

At the crime scene, the investigators observed a human figure silhouetted in the blood spray, which suggested the presence of at least two intruders, "[o]ne to do the shooting and one to be silhouetted by the spray." The investigators concluded the attackers made a forced entry because a window appeared to be tampered with. The investigators also discovered various items of physical evidence, including a ring and a gray or silver flashlight.

---

[1]We recite the facts in the light most favorable to Livers and Sampson, the non-moving parties. See Fed. R. Civ. P. 56(a), (e).

Based upon interviews CCSO Investigator Earl Schenck and Sergeant Sandra Weyers (Cass appellants) conducted with the Stocks' relatives, the investigators identified the Stocks' nephew, Livers, as a suspect. Some of these relatives reported Livers and the Stocks had argued and Sharmon Stock feared Livers. Livers is mentally retarded.[2] Between April 18 and 20, Sergeant Weyers, Investigator Schenck, and NSP Investigator William Lambert were told Livers was "mentally off," "slow," "different," and "immature for his age."

Investigators became suspicious after learning Will Sampson's (Will) car, a light brown, four-door Ford Contour, was detail cleaned on the day of the murders—April 17. Will is Sampson's brother. With Will's consent, the investigators searched Will's car and the vacuum bags from the auto detail shop. Neither the car nor the vacuum bags contained blood or other incriminating evidence. Between April 17 and April 21, witnesses reported to the investigators that they saw a light brown or tan four-door car with an "O" on the license plate parked near the Stocks' house on the morning of the murders. Will's car did not have an "O" on the license plate.

### 1. Livers Confesses, Then Recants

On April 17, 2006, Livers spoke to Investigators Schenck and Lambert and agreed to take a polygraph examination to "clear [his] name" of suspicion. On April 25, Investigators Schenck and Lambert drove Livers from his home to the Cass County Law Enforcement Center. They escorted Livers into a small, windowless room Livers described as uncomfortably cold. There is no indication Livers consulted with an attorney or other advisor during any of the April 25 interrogations. Though Livers told the investigators he had not eaten that day, he was not offered

---

[2]Livers' IQ measures in the bottom 1-2% of the adult population. He attended special education classes in school.

food until 7:24 p.m., more than ten hours after he arrived at the Law Enforcement Center.

Livers' first interview of the day began around 9:00 A.M. During this interview, Investigators Schenck and Lambert told Livers he could leave, but Livers agreed to stay and take a polygraph examination. Livers now asserts he did not understand he could leave or choose not to take the polygraph examination.[3]

After Livers had been speaking with Investigators Lambert and Schenck for nearly two hours, NSP Investigator Charles O'Callaghan entered the room and told Livers to put his keys and cell phone on a table. Investigator O'Callaghan took Livers to another room, advised Livers of his rights under Miranda, and administered a polygraph examination in which he questioned Livers about the murder of Wayne Stock. Livers repeatedly denied involvement. After the examination, Investigator O'Callaghan left the room. When Investigator O'Callaghan returned, he accused Livers of murdering the Stocks, claiming the polygraph left "no doubt" Livers had done so. A polygraph expert later testified the examination's design and implementation were so flawed that it could not reliably indicate whether Livers was being truthful.

After Investigator O'Callaghan left the room for a second time, Investigators Schenck and Lambert entered and resumed questioning Livers. They told Livers his polygraph results were "off the charts," repeatedly accused Livers of murdering the Stocks, and discounted Livers' protestations of innocence, sometimes with a loud voice. For example, Investigator Lambert told Livers, "You're full of s[---]. You did

---

[3]A forensic psychologist who reviewed the interviews and other materials concerning Livers concluded "it is not entirely clear to what degree Mr. Livers understood his Miranda [v. Arizona, 384 U.S. 436 (1996),] warning." (underline added).

too [kill the Stocks]." They repeatedly told Livers they would help him if he confessed, and suggested his execution if he did not. Investigator Schenck said:

> If you don't admit to me exactly what you've done, I'm going to walk out that door and I am going to do my level best to hang you're a[--] from the highest tree. . . . I will go after the death penalty. I'll push and I'll push and I'll push and I will do everything I have to, to make sure you go down hard for this.

Investigator Lambert told Livers he could not leave, saying, "Do you think you are going to get on a bus and you are going to leave? You are going to leave us? No, you're not." Later, but still before Livers confessed, Livers said he wanted to go home, but believed he could not do so. The investigators did not contradict this statement.

Livers denied involvement in the murders more than eighty times before he began to agree with the investigators' accusations. At 3:28 P.M., approximately six and a half hours after Livers began speaking to the investigators, Livers began to confess he murdered the Stocks.[4] Investigators Lambert and Schenck obtained the confession almost entirely through Livers' responses to leading, yes-or-no questions, for example, supplying Livers with information about the physical evidence.

> Inv. Schenck: And [Sharmon Stock] was trying to get on the phone, wasn't she?
> Livers: I guess.
> Inv. Schenck: Did she have the phone in her hand?
> Livers: Mmm, don't remember.

---

[4]The Cass appellants contend Livers confessed earlier, when he responded, "I didn't do it by myself," to the directive,"If you did it by yourself, then stand up and say so." A jury could infer Livers meant by this that he did not commit the murders at all, especially in view of Livers' other eighty denials.

Inv. Schenck: You don't remember. But you got pretty close to Aunt Sharmon, didn't you?
Livers: Right, I guess, I don't know.

When Investigator Schenck asked an open-ended question, "What happened after you fired that first shot?" Livers did not respond, remaining silent for several moments before Investigator Schenck resumed asking leading questions. Many of Livers' answers were "I don't know," "I guess," or "I'm not sure." Sampson's name entered the confession when Investigator Schenck suggested Livers must have received the keys to Will's car from someone who had access to them. Livers responded that Sampson gave him the keys. Livers then agreed with Investigator Schenck's suggestion Sampson provided the shotgun and ammunition.

A forensic psychologist who viewed the DVDs of Livers' interrogation concluded some of Livers' behavior during the interrogations may have indicated his mental impairment. For example, when Livers was told to "stand up" (confess) if he were a man, he literally stood up from his chair. In addition, Livers told Investigators Lambert and Schenk he was "dumb as a brick." Investigator Schenck later admitted Livers "appeared to be having difficulty understanding some of the questions" and "appeared to be a person who would understand simpler questioning."

The next day, April 26, Investigators Lambert and Schenck interrogated Livers again. Investigator Schenck later testified, "at this point Mr. Livers ha[d] been arrested and there[ was] no doubt that he[ was] in custody." The investigators used leading questions to get Livers to revise his confession to place Sampson in the Stocks' house during the murders. Livers previously had claimed Sampson did not enter the Stocks' house, which conflicted with the blood splatter pattern indicating two assailants. Livers consented to another polygraph, but then told Investigator O'Callaghan, "I was never on the scene. I don't know if [Sampson] is the actual person involved in this. I've been just making things up to satisfy you guys

and . . . basically, fitting an answer to what you guys have been asking." Both Livers' confession and his recantation were video recorded.[5]

Cass County Attorney Nathan Cox approved murder charges against Livers and Sampson after learning Livers had confessed and implicated Sampson.

### 2. Sampson is Arrested

Based on Livers' confession, Investigator Schenck arrested Sampson on April 25, 2006. Investigator Schenck did not seek or obtain a warrant before arresting Sampson. Sampson met with Sergeant Weyers and Investigator Lambert on April 26, 2006. During this meeting, Sampson waived his right to an attorney and agreed to take a polygraph examination. The polygraph examination indicated Sampson was being deceptive.

### 3. Investigation Continues

The Stock homicide investigation continued for months after Sampson's arrest and led investigators to evidence in several different states. The DCCSI, headed by Commander David Kofoed, did the forensic work for the investigation. Sheriff Dunning left "hands-on" supervision of the DCCSI to Commander Kofoed. "The purpose of the [DCCSI] is to identify, document, collect, and preserve evidence from crime scenes," as well as "examin[e] and process[] evidence utilizing scientifically accepted methods and procedures."

The Cass appellants, Investigators Lambert and O'Callaghan (NSP appellants), and Commander Kofoed met several times to coordinate the investigation, both before and after Livers confessed. During the investigation, Investigators Schenck and Lambert frequently visited the DCCSI, asking DCCSI employees to reprocess

---

[5]Investigator Lambert stated in an undated report that Investigator O'Callaghan claimed Livers' recantation was not recorded because of an equipment malfunction.

items whose initial testing had not linked Livers or Sampson to the crimes. One DCCSI employee reported feeling "pressured" to "find something."

Some of the physical evidence failed to support Livers' confession. For example, Livers confessed to using one of Sampson's guns to shoot the Stocks, but a search of Sampson's guns did not produce any incriminating evidence. Livers described using green or black shotgun shells, but the investigators discovered a red shotgun shell at the Stocks' home. Livers also claimed he entered through an unlocked door, but investigators found signs of a forced window entry. Finally, Livers said Sampson had used a red or yellow flashlight, rather than a gray flashlight like investigators found in the driveway of the Stocks' house.

Although the April 19 search of Will's car did not reveal any incriminating evidence, Commander Kofoed and Investigator C.L. Retelsdorf examined the car again on April 27, 2006. Commander Kofoed claimed that, during this search, he took a swab from under the dashboard that tested presumptively positive for human blood. Investigator Retelsdorf did not find any blood when he retested the area. Investigator Retelsdorf reported the results of examining the car, without mentioning Commander Kofoed's purported positive finding.

On May 8, 2006, Commander Kofoed reported his April 27 swab of Will's car, falsely claiming he took the swab on May 8, and failing to mention Investigator Retelsdorf's negative swab. Lab analysis revealed the blood was Wayne Stock's. Commander Kofoed later claimed the incorrect date on his report was a mistake. When Commander Kofoed told Captain Dean Olson about the incorrect date, they agreed Commander Kofoed should not correct the report, but should tell the prosecutor when the case was tried. Sheriff Dunning did not learn of this conversation until March 2008, more than one year after the charges against Livers and Sampson were dismissed.

In May 2006, Investigator Lambert and a DCCSI investigator traced an inscribed ring found in the Stocks' home to a truck stolen by Jessica Reid and Gregory Fester, two Wisconsin teenagers. Investigators found Reid's and Fester's DNA on the ring. Other physical evidence also connected Reid and Fester to the Stock murders.

After being confronted with the evidence against them, Reid and Fester admitted to involvement in the murders, each naming the other as the shooter and at first claiming only the two of them were involved. Investigators Schenck and Lambert promised Reid and Fester leniency if they admitted others were involved in the crime and threatened them with more severe punishment, including suggesting Reid might receive the death penalty, if they did not. Reid was shown pictures of Livers and Sampson. Eventually, both Reid and Fester changed their stories to implicate two other men, though Reid recanted this version within forty-eight hours. There was no other evidence linking Reid and Fester to Livers or Sampson.

Sergeant Weyers and Investigator O'Callaghan traveled to Texas and interviewed Ryan Paulding, a friend of Livers. During a July 6, 2006 interview, Paulding denied knowing of any plan to murder the Stocks. Paulding changed his story after failing a polygraph examination given by the Mansfield, Texas, Police Department. Paulding told officers that Livers had told Paulding he planned to kill the Stocks.

The next day, July 7, 2006, another polygraph examination indicated Paulding was being deceptive when he denied "know[ing] anyone from Wisconsin as being involved in killing the Stocks." Paulding again met with law enforcement, possibly Sergeant Weyers and Investigator O'Callaghan. At first, Paulding repeatedly denied knowing anyone from Wisconsin. An officer told Paulding she did not believe Paulding (1) told the investigators all he knew about the murders, and (2) did not know anyone from Wisconsin. One of the officers threatened to charge Paulding as

an accessory to murder or a co-conspirator because he was not cooperating. After about twenty minutes, Paulding said some people from Wisconsin might have come to the airport where Paulding worked. After Paulding's interview, Paulding's father told the Texas Ranger with whom the Nebraska investigators had been working that Paulding had an IQ of 70[6] and the maturity level of a fifteen-year-old.

### 4.    Livers' and Sampson's Charges are Dropped

In June or July of 2006, Commander Kofoed told the *Omaha World-Herald* newspaper that his finding of Wayne Stock's blood in Will's car may have resulted from cross-contamination. Sampson remained incarcerated until the charges against him were dismissed on October 6, 2006. On December 5, 2006, Cass County Attorney Cox dismissed the charges against Livers, which Cox said rested on Livers' confession and Commander Kofoed's claimed finding of Wayne Stock's blood in Will's car, noting a forensic psychologist concluded Livers "may have been coerced into a confession." Reid and Fester pled guilty to the murders in March 2007 and received life sentences.

### 5.    Allegations of Misconduct Against Commander Kofoed

DCCSI employee Darnel Kush claimed she suspected in October 2006 that Commander Kofoed was planting fingerprints at crime scenes, though she did not communicate this concern to her supervisors.[7] Kush eventually reported her concern about Commander Kofoed's evidence tampering to the FBI.

---

[6]"[A]n IQ of 70 or less indicates mental retardation." *Stedman's Medical Dictionary* 1680 (28th ed. 2006).

[7]Kush claims she did not report this suspicion to her supervisors because they reacted negatively to Kush's earlier complaints that Commander Kofoed "created a negative environment," impugned Kush's "reputation and . . . honor," and forged a letter of commendation for himself.

The FBI informed Sheriff Dunning in 2008 it was investigating allegations Commander Kofoed was tampering with evidence. Sheriff Dunning asserts this is the first he learned about possible problems with evidence tampering by Commander Kofoed. After learning of the FBI's investigation, Sheriff Dunning placed Commander Kofoed on administrative leave and initiated an Internal Affairs (IA) investigation of Commander Kofoed's conduct in the Stock murder investigation. The IA investigation concluded "there is no evidence to prove KOFOED planted the blood. On the contrary, there are mitigating circumstances . . . suggesting cross-contamination." The investigators did note "some 'administrative lapses' by KOFOED regarding the timeliness of reports and a chain-of-custody issue." Commander Kofoed told the IA investigators he suspected cross-contamination occurred.

In March 2010, Commander Kofoed was convicted on state charges of felony tampering with physical evidence. Commander Kofoed was also charged with—and ultimately acquitted of—several violations of federal law based on his conduct in the Stock homicide investigation. There are allegations Commander Kofoed may have tampered with evidence in other cases, though there is no indication in this record Sheriff Dunning knew of this possibility until after the charges against Livers and Sampson were dismissed.

## B.    Procedural History
### 1.    Livers

Livers sued, among others, the Cass appellants, the NSP appellants, and Dunning under 42 U.S.C. § 1983. Livers alleged the Cass and NSP appellants conspired with each other, Sheriff Dunning, Commander Kofoed, and others to violate Livers' civil rights, namely his (1) Fifth and Fourteenth Amendment rights to due process by coercing Livers' confession, planting blood evidence in Will's car, coercing Fester and Reid into implicating Livers in the crime, and attempting to coerce Paulding into saying Livers admitted to killing the Stocks; (2) Fourth and

Fourteenth Amendment rights by arresting Livers without probable cause; and (3) Fifth and Fourteenth Amendment rights to due process by concealing exculpatory evidence. Livers alleged the Cass appellants and NSP appellants further violated his constitutional rights by failing to intervene to prevent the other alleged constitutional violations.

Livers also claims Sheriff Dunning is liable for (1) causing Commander Kofoed to falsify a chain of custody for the blood evidence Commander Kofoed claimed to find in Will's car by his policies, his failure to train and supervise DCCSI personnel properly, and his failure to discipline Commander Kofoed; (2) failing to train his employees to disclose exculpatory evidence (of Commander Kofoed's wrongdoing), in violation of the Fifth and Fourteenth Amendments and Brady v. Maryland, 373 U.S. 83, 87 (1963); (3) conspiring with the Cass appellants, NSP appellants, and Commander Kofoed to violate Livers' civil rights; and (4) failing to intervene to prevent the alleged constitutional violations.

The Cass appellants, NSP appellants, and Sheriff Dunning moved for summary judgment based on qualified immunity. After discussing the two-step qualified immunity inquiry, the district court denied summary judgment because it found genuine issues of material fact. Appellants appeal.

### 2. Sampson

Sampson sued, among others, the Cass appellants and NSP appellants, claiming they (1) fabricated evidence to create the appearance of probable cause in violation of the Fourteenth Amendment's due process clause; (2) caused Sampson's arrest without probable cause in violation of the Fourth and Fourteenth Amendments; (3) conspired with each other, Commander Kofoed, and others to violate Sampson's civil rights; and (4) suppressed exculpatory evidence, in violation of the Fifth and Fourteenth Amendment rights to due process, as explained in Brady, 373 U.S. at 86-

87.[8] The district court denied the appellants' motions for summary judgment based on qualified immunity in an order that was nearly identical to the order denying summary judgment in Livers' case. Appellants appeal. Livers' and Sampson's cases were consolidated for appeal.

## II.    DISCUSSION

Appellants are entitled to qualified immunity unless (1) they violated a federal constitutional or statutory right belonging to Livers or Sampson (2) that was clearly established at the time of the violation, such that reasonable officials in appellants' positions would have known that they were violating that right. See Saucier v. Katz, 533 U.S. 194, 201-02 (2001). We may analyze the two prongs of this test in any order. See Pearson v. Callahan, 555 U.S. 223, 236 (2009).

> "[A]n order denying qualified immunity is immediately appealable even though it is interlocutory; otherwise it would be effectively unreviewable." Scott v. Harris, 550 U.S. 372, 376 n.2 (2007) (internal quotation omitted). However, this rule has limitations. A defendant may appeal an order denying summary judgment based on qualified immunity only "to the extent that it turns on an issue of law." Fields v. Abbott, 652 F.3d 886, 889-90 (8th Cir. 2011). A defendant may not appeal an order "insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." Johnson v. Jones, 515 U.S. 304, 320 (1995). This latter order is not deemed a "final decision," and thus appellate courts lack jurisdiction to hear such evidentiary-based appeals. Id. at 313; see also 28 U.S.C. § 1291 ("The courts of appeals . . . shall have jurisdiction of appeal from all *final decisions* of the district courts of the United States . . . ." (emphasis added)).

Jones v. McNeese, 675 F.3d 1158, 1160-61 (8th Cir. 2012) (internal citations altered).

---

[8]Sampson also asserted violations of the First, Eighth, and Ninth Amendments, but he has not pursued these arguments on appeal.

In reviewing a district court's denial of summary judgment based upon qualified immunity, we

> accept[] as true the facts that the district court specifically found were adequately supported, along with those facts that the district court likely assumed. Where there are questions of fact the district court did not resolve, we determine the facts that it likely assumed by viewing the record favorably to the plaintiff as in any other summary judgment motion.

Brown v. Frontner, 518 F.3d 552, 557-58 (8th Cir. 2008) (quoting Lockridge v. Bd of Trs. of the Univ. of Ark., 315 F.3d 1005, 1008 (8th Cir. 2003) (en banc)). Because the district court in the present cases did not make specific findings on every issue, we are compelled to search the record, "to determine what facts the district court . . . likely assumed." Johnson, 515 U.S at 319. "As with any summary judgment motion, while we are required to make all reasonable inferences in favor of the non-moving party, we do not resort to speculation." Brown, 518 F.3d at 558.

The Cass appellants contend we can decide whether a dispute is genuine by finding certain evidence insufficiently probative, citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986). To the extent Anderson supports this conclusion, Anderson was clarified and limited by Johnson, 515 U.S. at 320, as we recognized in Jones, 675 F.3d at 1160-61. "With respect to the legal issue[s] presented, we review the district court's denial of summary judgment de novo." Jones, 675 F.3d at 1161.

## A.    Individualized Analysis

The NSP appellants argue the district court erred by "lump[ing]" together all of the defendants instead of analyzing qualified immunity on an individual basis. The district court often did not specify which acts of which defendant required denying qualified immunity. The district court's opinion provides a clear enough basis for our analysis because the district court discussed the two steps of the qualified immunity analysis and found genuine issues of material fact. See id. at 1163 (remanding

-18-

"because the [district court's] analysis [was] so scant that [the appellate court was] unable to discern if the district court even applied both steps of the qualified immunity inquiry to all of the summary judgment claims"). When a district court does not state the facts it assumed as true, we "review . . . the record to determine what facts the district court, in the light most favorable to the nonmoving party, likely assumed." Johnson, 515 U.S. at 319; see Brown, 518 F.3d at 558. We now examine the record to determine whether each appellant is entitled to qualified immunity on each claim of each plaintiff.

### B.      Fifth Amendment Due Process

The district court erred in denying qualified immunity on Livers' and Sampson's Fifth Amendment due process claims because that amendment only restrains the federal government and none of the appellants are federal employees. See Baribeau v. City of Minneapolis, 596 F.3d 465, 484 (8th Cir. 2010).[9]

### C.      Coerced Confession and Evidence Fabrication

Intentionally or recklessly failing to investigate other leads or manufacturing false evidence may shock the conscience and can violate the Fourteenth Amendment's due process clause. See Winslow, __ F.3d at __, __, 2012 WL 4856169, at *11; Wilson v. Lawrence Cnty., Mo., 260 F.3d 946, 955-57 (8th Cir. 2001). We have referenced areas of "reckless investigation," which include: (1) coercing a suspect's confession; (2) "purposely ignor[ing] evidence suggesting . . . innocen[ce]"; and (3) "systemic pressure to implicate [a suspect] in the face of evidence to the contrary." Amrine v. Brooks, 522 F.3d 823, 833-35 (8th Cir. 2008)

---

[9]Livers and Sampson were not tried. A Fifth Amendment violation of their protection against self-incrimination, based upon a coerced confession, only arises when the coerced statements are used in the criminal case. See Chavez v. Martinez, 538 U.S. 760, 767 (2003) (plurality opinion); id. at 779 (Souter, J., concurring in the judgment); Winslow v. Smith, __ F.3d __, __, Nos. 11-2882, 11-2883, 11-2884, 11-2903, 2012 WL 4856169, at *10 n.4 (8th Cir. Oct. 15, 2012).

(citing Moran v. Clarke, 296 F.3d 638, 648 (8th Cir. 2002) (en banc) (Moran I), and Wilson, 260 F.3d at 955-56). Negligence and even gross negligence is not enough because the state action must be "truly egregious and extraordinary" to shock the conscience, Winslow, __ F.3d at __, __, 2012 WL 4856169, at *15 (quoting Strutton v. Meade, 668 F.3d 549, 557 (8th Cir. 2012)) (internal quotation marks omitted), and so severe as to amount to "brutal and inhumane abuse of official power," id. (quoting Golden ex rel. Balch v. Anders, 324 F.3d 650, 653 (8th Cir. 2003)) (internal quotation marks omitted). The "reckless[ness] standard normally contains a subjective component." Wilson, 260 F.3d at 956 n.9. Law enforcement "must be faithful to the overriding interest that 'justice shall be done.'" Id. at 957 (quoting United States v. Agurs, 427 U.S. 97, 110-11 (1976)).

The district court found "a showing that evidence was fabricated," as well as some evidence Livers' confession was coerced and appellants failed to investigate other leads. The district court noted whether appellants were sufficiently culpable to be liable under § 1983 was a fact question for the jury. We generally agree.

### 1. Cass Appellants and NSP Appellants
#### a. Livers' Confession
##### i. Livers' Claim

Livers claims the Cass appellants and NSP appellants are liable for coercing his confession. Coercing a confession violates the Fourteenth Amendment's Due Process Clause. See Wilson, 260 F.3d at 952. Whether particular interrogation techniques are unconstitutionally coercive depends on the totality of the circumstances, including the officers' conduct and the accused's characteristics. See id. at 952-53. In Wilson, we determined officers violated the clearly established due process rights of a mentally retarded man when they (1) had reason to know Wilson was mentally retarded; (2) interrogated him for over four hours; (3) never left him alone; (4) interrogated him without any friend, relative, or advisor present; (5) falsely claimed they had strong incriminating evidence; (6) promised leniency if Wilson

confessed and said Wilson would be found guilty if he did not; (7) "used threatening tones and language"; (8) refused to accept Wilson's protestations of innocence, threatening to use them to secure harsher penalties; and, (9) "[o]f particular concern," obtained the confession using leading questions that provided details about the crime. Id.

Here, the district court refused to grant qualified immunity on Livers' confession claim, citing evidence Livers' confession was coerced and "some dispute about whether or when the defendants knew or should have known of [Livers'] mental deficiencies."

As in Wilson, there is evidence Livers is mentally retarded and Investigators Lambert, Schenck, and O'Callaghan knew or should have known Livers was mentally retarded.[10] A forensic psychologist opined Livers showed signs of mental retardation during the interrogation. For example, when Livers was told to "stand up" if he were a man, he literally stood up from his chair. Livers told Investigators Lambert and Schenk he was "dumb as a brick." Investigator Schenck admitted Livers "appeared to be having difficulty understanding some of the questions," and the investigators were told before the April 25 interrogation of Livers that Livers was "slow," "different," "mentally off," and "immature for his age."

_____

[10]The NSP appellants contend there is no fact issue because the veracity of the DVDs of Livers' confession are undisputed. Though the veracity of the DVDs is undisputed, conflicting inferences can be drawn from the actions and statements recorded therein, and the parties dispute both the extent of Livers' mental impairment and appellants' knowledge of it. We must view the evidence in the light most favorable to Livers and make all reasonable inferences in his favor. See Johnson, 515 U.S. at 319. To the extent appellants contend any issue of fact is not genuine, we cannot reach this issue. See id. at 319-20.

Investigators Schenck, Lambert, and O'Callaghan interrogated Livers for approximately six and a half hours before Livers confessed, significantly longer than Wilson's four-hour interrogation. See id. at 952. Like Wilson, Livers did not have an attorney, relative, or other advisor present during the interviews. The investigators told Livers the polygraph irrefutably indicated Livers' guilt. Investigators promised to help Livers if he confessed and told Livers he would be executed if he did not. Investigators Schenck and Lambert ridiculed Livers' protestations of innocence, which they threatened to use against Livers. In doing so, the investigators "used threatening tones and language." See id. at 953. Livers denied knowledge of or involvement in the murders more than eighty times before he began to confess. Investigators Lambert and Schenck obtained Livers' confession almost entirely through the use of leading questions that provided the details about the murders.

The NSP appellants attempt to distinguish Wilson, noting the officers picked up Wilson "under the pretense of having him identify a lost wallet," id. at 950, whereas Livers consented to giving an interview and taking a polygraph exam. This distinction is significant, but these are fact issues and do not directly affect our qualified immunity legal determination. Although Livers, like Wilson, was advised of his Miranda rights, "[a]dvising a suspect of his rights does not automatically mean that any subsequent confession is voluntary . . . , particularly when [the officers] know the suspect is unlikely to fully understand those rights." Id. at 953. Whether Livers understood his Miranda rights is a disputed fact for the jury in this case.

The cases the Cass appellants cite to support their position that Livers confessed voluntarily are distinguishable. The suspect in Sheets v. Butera, 389 F.3d 772, 775, 779 (8th Cir. 2004), was questioned for only one hour before confessing and the plaintiff did not show the confession was obtained through leading questions that provided information about the crime. Berghuis v. Thompkins, ___ U.S. ___, ___, 130 S. Ct. 2250, 2259-64 (2010), is inapposite because it addressed whether a suspect invoked his right to remain silent under Miranda, not whether his rights to

substantive due process were violated or whether his confession was the product of police coercion. The Cass appellants also cite a long list of cases in which a court found a confession voluntary even though the suspect had a low IQ. In all but one of these cases, there was no evidence of police overreaching, unlike in Livers' case. See United States v. Makes Room for Them, 49 F.3d 410, 412-15 (8th Cir. 1995); United States v. Chischilly, 30 F.3d 1144, 1151 (9th Cir. 1994); United States v. Frank, 956 F.2d 872, 875-78 (9th Cir. 1991); Derrick v. Peterson, 924 F.2d 813, 817-19 (9th Cir. 1990); United States v. Macklin, 900 F.2d 948, 950-52 (6th Cir. 1990); Moore v. Dugger, 856 F.2d 129, 131-32 (11th Cir. 1988); Dunkins v. Thigpen, 854 F.2d 394, 399 (11th Cir. 1988); Winfrey v. Wyrick, 836 F.2d 406, 410-12 (8th Cir. 1987); Vance v. Bordenkircher, 692 F.2d 978, 981 (4th Cir. 1982); Hall v. Wolff, 539 F.2d 1146, 1149-52 (8th Cir. 1976); Coney v. Wyrick, 532 F.2d 94, 97-98 (8th Cir. 1976); Fairchild v. Lockhart, 744 F. Supp. 1429, 1437, 1449 (E.D. Ark. 1989). The remaining case cited by the Cass appellants, Sumpter v. Nix, 863 F.2d 563, 565 (8th Cir. 1988), included a long interrogation and manipulation of the suspect's emotions. However, there is no indication any of the other factors present in Wilson and this case—such as a confession procured using leading questions and isolating the suspect from any advisor during the interrogation—existed in Sumpter. See id.; Wilson, 260 F.3d at 952-53. "[S]tate officials [may not] cherry-pick cases that address individual potentially coercive tactics, isolated one from the other, in order to insulate themselves when they have combined all of those tactics in an effort to overbear an accused's will." Wilson, 260 F.3d at 953.

Finally, the NSP appellants argue the first interview, before the polygraph, was not coercive. If true, this is not determinative of Livers' claim because the conduct of Investigators Schenck, Lambert, and O'Callaghan *after* the polygraph, which led to Livers' confession, arguably was coercive.

The alleged actions of Investigators Schenck, Lambert, and O'Callaghan during Livers' interrogation potentially violated a right that was clearly established by

-23-

<u>Wilson</u> in 2001, well before Livers was interrogated.  <u>See</u> <u>id.</u> at 952-53.  Though fact and credibility issues about the appellants' culpability remain, a reasonable officer would have known the alleged conduct violated Livers' rights as described in <u>Wilson</u>. <u>See</u> <u>id.</u>

The district court properly denied Investigator Schenck's and the NSP appellants' motions for summary judgment on this claim.  There is no evidence Sergeant Weyers was involved in the interrogation, but she may be liable as a co-conspirator for coercing Livers' confession, if Livers proves a conspiracy and a coerced confession.  <u>See</u> <u>Slavin v. Curry</u>, 574 F.2d 1256, 1263 (5th Cir. 1978) (noting defendants who conspire to deprive a plaintiff of his or her constitutional rights are jointly liable for their co-conspirators' acts in furtherance of the conspiracy), <u>overruled</u> <u>on</u> <u>other</u> <u>grounds</u>, <u>Sparks v. Duval Cnty. Ranch Co.</u>, 604 F.2d 976, 978 (5th Cir. 1979); <u>see</u> <u>also</u> <u>infra</u> section II.G.1 (discussing Livers' conspiracy claim).

### ii.        Sampson's Claim

Sampson contends on appeal that appellants violated his Fifth Amendment right against self-incrimination by coercing Livers' confession.  To the extent Sampson raised this issue in the district court,[11] the district court erred in denying qualified immunity on this claim because a plaintiff does not have standing to claim a Fifth Amendment self-incrimination violation based on someone else's coerced confession.  <u>See</u> <u>van Leeuwen v. United States</u>, 868 F.2d 300, 301-02 (8th Cir. 1989).

---

[11]Sampson arguably waived any such claim by not clearly raising it in his amended complaint.  <u>See</u> <u>Hulsey v. Astrue</u>, 622 F.3d 917, 924 (8th Cir. 2010) (noting an issue not raised below is waived).  <u>See</u> <u>also</u> discussion, supra n.9 (explaining a Fifth Amendment self-incrimination violation only occurs when the covered statements are used against the speaker in a criminal prosecution).

### b.  Fabrication of Evidence

It was clearly established by 2006 that the Fourteenth Amendment's guarantee of due process is violated by "the manufacture of . . . false evidence" in order "to falsely formulate a pretense of probable cause." Moran I, 296 F.3d at 647; see Moran v. Clarke, 359 F.3d 1058, 1060-61 (8th Cir. 2004) (Moran II); see also Wilson, 260 F.3d at 957. Livers and Sampson contend all appellants conspired with each other and with Commander Kofoed to fabricate evidence against them, in violation of their Fourteenth Amendment rights to due process. Livers and Sampson both specifically allege (1) Commander Kofoed "planted Wayne Stock's blood on a swab purportedly taken from" Will's car; (2) Investigators Lambert and Schenck coerced Reid into falsely implicating Livers and Sampson; and (3) Investigator O'Callaghan and Sergeant Weyers attempted to coerce Paulding into falsely saying Livers admitted to murdering the Stocks. Livers also contends Investigators Lambert and Schenck coerced Fester into implicating Livers. The district court found, without further elaboration, "there was a showing that evidence was fabricated" against Livers and Sampson and "[t]he extent of [the Cass appellants' and NSP appellants'] knowledge of, or complicity in, that act is a question of fact for the jury." In a qualified immunity interlocutory appeal, this finding is enough.

For example, Livers and Sampson presented evidence allowing a jury to infer Commander Kofoed planted blood evidence in Will's car. One can infer from this evidence that Commander Kofoed intended to implicate Livers and Sampson, men with close familial ties to Will. Evidence indicates Livers' confession was coerced. Investigator Schenck suggested Sampson provided Livers with the murder weapon and ammunition, and Investigators Schenck and Lambert pressured Livers to change his story to place Sampson in the Stock home at the time of the murders. Some evidence also intimated Investigators Schenck and Lambert pressured Fester and Reid to change their stories to implicate Livers and Sampson in the murders. It is reasonable to infer Sergeant Weyers may have threatened Paulding to encourage Paulding to say Livers had admitted to the murders. A jury could infer Investigator

O'Callaghan's involvement in Livers' allegedly flawed polygraph examination and presence on the trip to Texas to interview Paulding shows he helped develop the strategy for interrogating Livers and Paulding or otherwise was a co-conspirator. Finally, there is testimony that Investigators Schenck and Lambert frequently asked DCCSI employees to retest items when initial tests did not link Livers or Sampson to the crimes, and one DCCSI employee reported feeling pressured to "find something." The district court properly denied summary judgment to the Cass appellants and NSP appellants on this claim based upon the allegations, with supporting evidence, regarding their individual actions, and, to the extent Livers and Sampson prove a conspiracy, based upon the actions of their alleged co-conspirators. See Slavin, 574 F.2d at 1263, see also infra section II.G.1 (discussing Livers' and Sampson's conspiracy claims).

### 2. Sheriff Dunning's Liability

Livers does not allege Sheriff Dunning directly participated in any alleged constitutional violation, but rather claims Sheriff Dunning is liable in a supervisory capacity for Commander Kofoed's and others' misconduct. The district court made only two findings specifically about Sheriff Dunning or the DCSO, noting there was evidence suggesting (1) DCSO employees knew of Commander Kofoed's "administrative lapses;" and (2) Sheriff "Dunning's failure to train, supervise, and discipline the" DCCSI staff, including Commander Kofoed, "contributed to the evidence fabrication and resulted in the concealing of evidence from [Livers], his counsel, and the prosecutor."

#### a. Failure to Train or Supervise

Sheriff Dunning cannot be liable for Commander Kofoed's actions based on respondeat superior. See Wagner v. Jones, 664 F.3d 259, 275 (8th Cir. 2011). Sheriff Dunning may be liable under § 1983 if he (1) had "notice of a pattern of unconstitutional acts committed by subordinates"; (2) was deliberately indifferent to or tacitly authorized those acts; and (3) failed to take "sufficient remedial action";

(4) proximately causing injury to Livers. Andrews v. Fowler, 98 F.3d 1069, 1078 (8th Cir. 1996) (quoting Jane Doe A. v. Special Sch. Dist. of St. Louis Cnty., 901 F.2d 642, 645 (8th Cir. 1990)). In order to show deliberate indifference or tacit authorization, Livers must allege and ultimately prove Sheriff Dunning "had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation." Id. The district court denied Sheriff Dunning summary judgment under this theory, but did not cite any specific reasoning or evidence. We review the record to see which facts the district court may have assumed. See Johnson, 515 U.S. at 319.

In Andrews, we concluded there was no "patently obvious need . . . to specifically train officers not to rape young women." Andrews, 98 F.3d at 1077. Similarly, Sheriff Dunning faced no "patently obvious need" to train DCCSI employees—whose job was to "identify, document, collect, and preserve evidence from crime scenes"—not to fabricate evidence. See id. Any reasonable DCCSI employee would know fabricating evidence is unacceptable. Livers maintains "Dunning's failure to train his employees in their duty to disclose exculpatory material resulted in the fabrication of evidence against" Livers. Livers does not causally link this alleged failure to Commander Kofoed's misconduct. As such, this alleged training failure cannot be a basis for Sheriff's Dunning's liability.

Livers also contends Sheriff "Dunning's failure to adequately supervise DCCSI resulted in the violation of [Livers'] constitutional right . . . not to have evidence fabricated against him." Livers argues Sheriff Dunning should be held liable because Sheriff Dunning admitted he left day-to-day supervision of the DCCSI to Commander Kofoed. Livers maintains Sheriff Dunning should have known Commander Kofoed would abuse his position by fabricating evidence because of (1) alleged unrelated dishonesty by Commander Kofoed; (2) Kush's complaints about Commander Kofoed to her supervisors; and (3) Commander "Kofoed's fishy 2006 public statement that

-27-

his finding of Wayne Stock's blood in Will's car may have been the result of contamination."

To impose supervisory liability, other misconduct must be very similar to the conduct giving rise to liability. Cf. Jane Doe A, 901 F.2d at 646 n.4 (holding notice of an employee's sexual misconduct with adults did not provide notice of his sexual misconduct with children). Notice of allegations Commander Kofoed committed dishonest acts unrelated to handling evidence is not sufficient to support Sheriff Dunning's liability for a failure to supervise. Cf. id. The district court's finding that some DCSO employees knew of Commander Kofoed's "administrative lapses" is legally insufficient to impose supervisory liability. See Andrews, 98 F.3d at 645 (requiring the defendant to have had notice). Nor does our own review of the record reveal notice to Sheriff Dunning. In the internal affairs report covering Commander Kofoed, none of the employees interviewed reported suspecting Commander Kofoed of misconduct in any investigation. The same report concluded there was no evidence Kofoed planted evidence in the Stock homicide investigation. Nor was Sheriff Dunning notified of Kush's concerns about Commander Kofoed's handling of evidence until after the Stock investigation was over.

Without guidance from the district court on what facts and assumptions it relied upon for its decision, we undertook the "cumbersome review of the record to determine what facts the district court, in the light most favorable to the nonmoving part[ies], likely assumed." Johnson, 515 U.S. at 319. Our cumbersome review of more than 65 bound volumes and 40 video DVDs drew a blank. There is no evidence, or reasonable inference from any evidence, indicating Sheriff Dunning had notice Commander Kofoed may have mishandled evidence in this or any other investigation until after the Stock investigation ended, too late to prevent injury to Livers.

Livers also alleges Sheriff Dunning's supervision was inadequate because he did not properly investigate and discipline DCCSI employees for misconduct. Livers contends Sheriff Dunning never disciplined DCCSI employees for possible mishandling of evidence, which made Commander Kofoed think he would not be punished for planting evidence. This assertion is mere speculation and argument, and is not a basis for denying qualified immunity. See Reed v. City of St. Charles, Mo., 561 F.3d 788, 790-91 (8th Cir. 2009) (noting a party cannot withstand summary judgment based on "speculation, conjecture, or fantasy" (quoting Moody v. St. Charles Cnty., 23 F.3d 1410, 1412 (8th Cir. 1994)) (internal quotation marks omitted); see also Brown, 518 F.3d at 558 (when reviewing a district court's denial of summary judgment on the grounds of qualified immunity, "we do not resort to speculation.").

Livers' final contention—that Sheriff Dunning knew Captain Olson instructed Commander Kofoed not to correct Commander Kofoed's report about the date he "discovered" the blood evidence in Will's car—is similarly unavailing. Captain Olson did not share this information with Sheriff Dunning until March 2008, long after Sheriff Dunning could have prevented injury to Livers. Again, the record does not support any finding that Sheriff Dunning received notice of the alleged misconduct in time for any failure to act by Sheriff Dunning to have injured Livers.

Sheriff Dunning is entitled to qualified immunity both on Livers' failure-to-train claim and his failure-to-supervise claim.

### b.    Ratification

Livers also cites City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988), and Speer v. City of Wynne, Ark., 276 F.3d 980, 987 (8th Cir. 2002), for his claim Sheriff Dunning should be liable because he ratified Commander Kofoed's fabrication of evidence after it occurred. Praprotnik and Speer are inapposite because they involve municipal—not individual—liability. See Praprotnik, 485 U.S. at 127; Speer, 276

F.3d at 987. Applying those cases would violate the principle that a supervisor who does not directly participate in an employee's constitutional violation can only be liable for the violation when it was caused by the supervisor's failure to train or supervise his or her employees properly. See Wagner, 664 F.3d at 275.

### D.    False Arrest and Detention

Livers and Sampson both allege the Cass appellants and NSP appellants violated their Fourth and Fourteenth Amendment rights against arrest without probable cause. The district court denied qualified immunity on these claims based on evidence indicating "a reasonably well-trained officer would have known that there was no arguable probable cause to arrest" Livers or Sampson.

It was clearly established by 2006 that a seizure without "a truthful factual showing sufficient to constitute probable cause" violates the Fourth Amendment. Hedges v. Poletis, 177 F.3d 1071, 1074 (8th Cir. 1999). For purposes of qualified immunity, we must inquire whether it was objectively reasonable for the officers to think they had probable cause at the time Livers and Sampson were arrested. See Amrine, 522 F.3d at 832.

A person is seized "within the meaning of the Fourth and Fourteenth Amendments . . . when, 'taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" Kaupp v. Texas, 538 U.S. 626, 629 (2003) (quoting Florida v. Bostick, 501 U.S. 429, 437 (1991)) (internal quotation marks omitted).

#### 1.    Livers

Though Livers' interrogation started as voluntary, Livers was seized within the meaning of the Fourth Amendment, at the latest, when Investigator Lambert told Livers after the polygraph examination, "Do you think you are going to get on a bus

-30-

and you are going to leave?  You are going to leave us? No, you're not."  Shortly thereafter, Livers expressed his desire to leave and belief that he could not. Investigator Schenck and Investigator Lambert did not contradict this statement.  A reasonable person in Livers' position would not believe he was free to leave.

At the time Livers was seized, he had not yet begun to confess.  At that point, the only information implicating Livers in the murders was speculation and the questionable polygraph results.  Rumor alone is not sufficient to establish probable cause.  See Henry v. United States, 361 U.S. 98, 101 (1959).  Livers proffered a polygraph expert's statement that Livers's polygraph results could not be read as deceptive.  A jury reasonably could question Investigator O'Callaghan's exam and purposes.  The evidence, viewed in the light most favorable to Livers, indicates a reasonable officer who knew of the polygraph examination's flaws would not reasonably have thought he had probable cause to arrest Livers.  A reasonable jury could infer from the close cooperation between Investigators Schenck, Lambert, and O'Callaghan during Livers' April 25 interrogations that Investigators Schenck and Lambert knew the polygraph examination was fundamentally flawed.[12]

The Cass appellants contend they are entitled to qualified immunity to the extent Livers claims they prolonged Livers' detention.  They maintain any delay in Livers' release was caused by Livers' attorney's failure to inform Cox of Livers' mental limitations.  This is a fact question not appropriately resolved at this stage.

_____

[12] Any after-acquired probable cause appellants cite now is irrelevant. The Cass appellants argue that because a state court judge presiding over Sampson's criminal proceedings later found Livers' confession created probable cause to arrest Sampson, appellants, who were not trained as lawyers, must have had probable cause to detain Livers.  We decline to accept the state court opinion as dispositive on this issue.

### 2. Sampson

At the time Investigator Schenck arrested Sampson, the only information implicating Sampson was Livers' confession. As discussed above, a jury could find Livers' confession was coerced. No reasonable officer could believe statements from a coerced confession could alone provide probable cause to arrest Sampson. Investigator Schenck knew of the circumstances surrounding Livers' confession because he participated in it. The district court properly denied qualified immunity on Sampson's Fourth Amendment claims against Investigator Schenck. None of the other appellants were involved in Sampson's arrest, and would be entitled to qualified immunity on Sampson's false arrest claim, except to the extent they were involved in a conspiracy to violate Sampson's constitutional rights. See Slavin, 574 F.2d at 1263, see also infra section II.G.1 (discussing Sampson's conspiracy claim).

### E. Brady Claim

Livers and Sampson allege all of the appellants are liable for failing to disclose exculpatory evidence, including information about Livers' recantation of his confession and Kofoed's handling of the blood evidence, in violation of Brady, 373 U.S. at 87, and Fourteenth Amendment due process. The district court found "evidence from which a reasonable juror could infer that the defendants intentionally, or in bad faith, failed to disclose exculpatory material or deliberately withheld exculpatory information that prevented the prosecutor from complying with Brady."

Assuming appellants failed to disclose exculpatory evidence, there was no Brady violation because Livers and Sampson were not convicted. See Strickler v. Greene, 527 U.S. 263, 281 (1999) (holding Brady is violated only when "there is a reasonable probability that the suppressed evidence would have produced a different *verdict*") (emphasis added); see also, e.g., Morgan v. Gertz, 166 F.3d 1307, 1310 (10th Cir. 1999) (explaining that where "all criminal charges were dismissed prior to trial[,] . . . courts have held universally that the right to a fair trial is not implicated and, therefore, no cause of action exists under § 1983"); Flores v. Satz, 137 F.3d

-32-

1275, 1278 (11th Cir. 1998) (refusing to find a <u>Brady</u> violation where the criminal defendant "was never convicted and, therefore, did not suffer the effects of an unfair trial"). Sampson asserts <u>Brady</u> applies in the absence of a conviction because we addressed a <u>Brady</u> claim by analyzing the prejudicial effect of withheld evidence on a suppression hearing in <u>United States v. Hernandez</u>, 299 F.3d 984, 990 (8th Cir. 2002). Sampson's interpretation of <u>Hernandez</u> may conflict with the Supreme Court's holding in <u>Strickler</u>, 523 U.S. at 281. In addition, unlike Livers and Sampson, Hernandez was convicted. <u>See</u> id at 988. In <u>Hernandez</u>, we addressed whether the withheld evidence changed the outcome of the suppression hearing—the evidence could not have affected the verdict if it did not first affect the suppression hearing.

On appeal, Livers acknowledges <u>Brady</u> does not apply absent a conviction, but contends <u>Kennell v. Gates</u>, 215 F.3d 825 (8th Cir. 2000), establishes a Fourteenth Amendment due process obligation promptly to disclose exculpatory information to avoid prolonging pre-trial detention. Livers' reliance on <u>Kennell</u> is misplaced. <u>Kennell</u> did not involve a failure to disclose evidence, but rather whether knowingly detaining the wrong person violates the Fourth Amendment. <u>Id.</u> at 826, 828-30.

Our sister circuits disagree over whether pretrial detainees such as Livers and Sampson have a right to disclosure of exculpatory evidence. The Fifth Circuit concluded a police officer's "deliberate failure to disclose . . . undeniably credible and patently exculpatory evidence to the prosecuting attorney's office" violates a clearly established constitutional right, <u>Sanders v. English</u>, 950 F.2d 1152, 1158, 1160-62 (5th Cir. 1992). The Fourth Circuit reached the opposite result in <u>Taylor v. Waters</u>, 81 F.3d 429, 435-37 (4th Cir. 1996). The Fourth Circuit determined a police officer's failure "to disclose exculpatory evidence after a determination of probable cause has been made by a neutral detached magistrate" neither violates the Fourteenth Amendment's Due Process Clause nor "render[s] the continuing pretrial seizure of a criminal suspect unreasonable under the Fourth Amendment." <u>Id.</u> at 436-37. Given

-33-

the split of authority, we cannot say a pretrial right to disclosure of exculpatory evidence, if it exists, was clearly established in 2006.  See Ambrose v. Young, 474 F.3d 1070, 1077 (8th Cir. 2007) ("Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." (quoting Davis v. Hall, 375 F.3d 703, 712 (8th Cir. 2004) (internal quotation marks omitted)).  Appellants are entitled to qualified immunity on Livers' and Sampson's claims based on any failure to disclose evidence.

### F.    Failure to Intervene

Livers contends all of the appellants are liable for failing to intervene to stop alleged constitutional violations.  The district court noted that other circuits have recognized a duty to intervene to stop all constitutional violations.  The district court made no explicit holding on this claim, and we reach our own conclusion based on our de novo review of the record.  See Johnson, 515 U.S. at 319.

A law enforcement officer who knows another officer is using excessive force has a duty to intervene.  See Putman v. Gerloff, 639 F.2d 415, 423 (8th Cir. 1981).  We have not recognized a duty to intervene to prevent other constitutional violations.  Though other circuits have recognized a duty to intervene outside of the excessive force context, see Randall v. Prince George's Cnty., Md., 302 F.3d 188, 204 (4th Cir. 2002); Reid v. Wren, Nos. 94-7122, 94-7123, 94-7124, 1995 WL 339401, at *2 (10th Cir. 1995) (unpublished); Yang v. Hardin, 37 F.3d 282, 285 (7th Cir. 1994); Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994), the Eleventh Circuit refused to find a clearly established duty to intervene to stop other constitutional violations, see Jones v. Cannon, 174 F.3d 1271, 1286 (11th Cir. 1999).[13]

_____

[13]We reject Livers' contention the Eleventh Circuit implicitly overruled Jones by imposing a duty to intervene to prevent false arrest in Lepone-Dempsey v. Carrol Cnty. Com'rs, 159 F. App'x 916, 920 (11th Cir. 2005) (unpublished).  Lepone-Dempsey involved an excessive force claim based on the alleged unlawfulness of the plaintiff's arrest.  See id. at 920.

Assuming law enforcement officers have a constitutional duty to intervene outside of the excessive force context, such a duty was not clearly established in 2006. Where, as here, the federal circuits disagree on whether conduct violates the Constitution, and our court has not addressed the question, that conduct does not violate clearly established law because "it is unfair to subject police to money damages for picking the losing side of the controversy." Wilson v. Layne, 526 U.S. 603, 618 (1999). Appellants are entitled to qualified immunity on Livers' failure-to-intervene claim.

## G.    Conspiracy

If appellants conspired to deprive Livers or Sampson of their constitutional rights, each is jointly liable for his or her co-conspirators' acts in furtherance of the conspiracy. See Slavin, 574 F.2d at 1263; cf. White v. McKinley, 519 F.3d 806, 815-16 (8th Cir. 2008) (affirming the denial of summary judgment to a private defendant on a claim the private defendant conspired with a police officer to falsely arrest and maliciously prosecute the plaintiff). To prove a civil conspiracy under § 1983, Livers and Sampson must show

> (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action to be taken; (4) the commission of one or more unlawful overt acts; and (5) damages as the proximate result of the conspiracy.

Temporomandibular Joint (TMJ) Implant Recipients v. Dow Chem. Co. (In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.), 113 F.3d 1484, 1498 (8th Cir. 1997). Evidence of "an agreement to deprive [a] plaintiff of constitutionally guaranteed rights" typically is circumstantial. White, 519 F.3d at 816. For example, we held in White that evidence suggesting a defendant may have concealed exculpatory evidence, "stood to gain financially" from those acts, and was romantically involved with the primary wrongdoer was sufficient to show an agreement to violate the plaintiff's rights. See id.

-35-

In Moran I, we found a conspiracy to violate a suspect's civil rights on facts similar to those alleged here, and concluded the plaintiff presented evidence of a conspiracy to deprive the plaintiff of his civil rights where

> [the plaintiff] introduced evidence that tends to show a police department that publicly and financially committed itself to producing a culprit for an alleged wrongdoing before any such wrongdoing was actually established. He produced proof of questionable procedures, of pressures placed on [witnesses] to incriminate a specific person or to corroborate the department's official line, of a hasty condemnation of [the plaintiff] and of improper consideration of his race. Moreover, he offered proof that, at various times, certain defendants purposely ignored evidence that strongly tended to exonerate him.

Moran I, 296 F.3d at 647-48.

Here, the district court discussed the law concerning conspiracy and noted "evidence of numerous meetings between the defendants," but the district court made no specific finding about conspiracy. Although the district court should have made a finding on the conspiracy claim, we review the record de novo and reach our own conclusion. See Johnson, 515 U.S. at 319.

### 1.    Cass Appellants and NSP Appellants

The evidence, viewed in the light most favorable to Livers and Sampson, suggests the Cass appellants and NSP appellants conspired with each other and Commander Kofoed to violate Livers' and Sampson's constitutional rights. Livers and Sampson presented some evidence that would allow a reasonable juror to infer some or all of these appellants and Kofoed coerced Livers' confession, fabricated evidence against Livers and Sampson, and arrested them without probable cause. In addition, as in Moran I, Livers and Sampson have proffered evidence the Cass appellants and NSP appellants ignored facts—such as the circumstances of Livers' confession and the lack of physical evidence linking Livers and Sampson to the

-36-

crime—"that strongly tended to exonerate [Livers and Sampson]." Moran I, 296 F.3d at 648. "In short, drawing all inferences in [their] favor, a reasonable jury could conclude that some or all or the [Cass appellants and NSP appellants] intentionally set up . . . innocent [Livers and Sampson] for patently arbitrary reasons." Id. To the extent the specific acts discussed above may violate the Constitution, they are sufficient overt acts to support a civil rights conspiracy claim. Livers' and Sampson's damages are their detention.

There is circumstantial evidence of a meeting of the minds. The record contains evidence of meetings about the Stock investigation involving the Cass appellants, NSP appellants, and Commander Kofoed, both before and after Livers' confession. Of course, "[v]arious people engaged in investigating and reporting suspected criminal activity does not amount to conspiracy. We look for a genuine factual issue of concerted activity toward an unlawful objective." Myers v. Morris, 810 F.2d 1437, 1454 (8th Cir. 1987), abrogated on other grounds, Burns v. Reed, 500 U.S. 478, 483-84 n.2, 496 (1991). The jury may find appellants' meetings were unrelated to any alleged conspiracy. However, the jury could find those meetings, when combined with evidence of numerous acts by appellants suggesting an intent to fabricate evidence and to prosecute Livers and Sampson in the face of contrary evidence, indicate a concerted effort to achieve an unlawful goal.

Livers and Sampson have presented sufficient allegations and evidence of a violation of a clearly established right to survive the Cass appellants' and NSP appellants' motion for summary judgment on Livers' and Sampson's conspiracy claims. To the extent Livers and Sampson prove a conspiracy to violate their constitutional rights, the Cass appellants and NSP appellants are liable for their co-conspirators' actions. Though these appellants may have acted reasonably and may have diligently investigated all leads, the "drawing of inferences and evaluation of witness credibility . . . remain the province of the jury." Moran I, 296 F.3d at 648.

### 2.     Sheriff Dunning

Our analysis differs as to Sheriff Dunning. "We . . . examine the information possessed by [Sheriff Dunning] in order to determine whether, given the facts known [to him] at the time, a reasonable government official would have known that his actions violated the law." Miller v. Schoenen, 75 F.3d 1305, 1308 (8th Cir. 1996). There is no evidence Sheriff Dunning knew of the other appellants' alleged unconstitutional acts. A reasonable officer in Sheriff Dunning's position would not have known that any aspects of the investigation into Livers and Sampson violated the law. Sheriff Dunning is entitled to qualified immunity on Livers' conspiracy claim.

## III.   CONCLUSION

We affirm in part, reverse in part, and remand for further proceedings. We affirm the denial of qualified immunity with regard to Livers' and Sampson's claims against the Cass appellants and the NSP appellants alleging those appellants fabricated evidence, caused Livers and Sampson to be arrested without probable cause, and conspired to violate Livers' and Sampson's civil rights. We also affirm the district court's denial of qualified immunity on Liver's claim the Cass appellants and NSP appellants coerced Livers' confession.

We reverse the district court's denial of qualified immunity on Livers' and Sampson's claims based on the Fifth Amendment right to due process and the alleged failure to disclose exculpatory evidence (Brady claim). We also reverse the denial of qualified immunity for Sheriff Dunning on all claims and to all appellants on Livers' claims based upon appellants' alleged failure to intervene.

_____

-38-