# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 07-1002/1166

_____

| | |
|---|---|
| Theodore W. White, Jr., | * |
| | * |
| Appellee, | * |
| | * Appeal from the United States |
| v. | * District Court for the |
| | * Western District of Missouri. |
| Detective Richard McKinley, | * |
| Individually and in his official | * |
| capacity; Tina McKinley, | * |
| | * |
| Appellants. | * |

_____

Submitted: October 19, 2007
Filed: February 26, 2008

_____

Before BYE, BOWMAN, and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

Theodore White, Jr. brought this civil action following his prosecution, conviction, re-prosecution, and eventual acquittal for the alleged molestation of his adopted daughter. White sued his ex-wife, Tina McKinley, and the police officer who investigated the molestation charges, Richard McKinley, who is also Tina's current husband. White alleged a deprivation of constitutional rights and various common law torts. The McKinleys moved the district court for summary judgment on all counts, based, at least in part, on a qualified immunity defense, and both motions were denied

in part and granted in part. The district court[1] denied Richard's motion as to (1) the 42 U.S.C. § 1983 conspiracy claim and (2) the 42 U.S.C. § 1983 claim based on suppression of exculpatory evidence. Tina's motion was denied as to (1) the 42 U.S.C. § 1983 conspiracy claim, (2) false arrest claim, and (3) malicious prosecution claim. Tina and Richard bring this interlocutory appeal arguing that the district court should have granted their summary judgment motions in their entirety. We affirm.

## I. *Background*

The following facts are uncontested or viewed in the light most favorable to White, the non-moving party. White married Tina in 1991. At the time, Tina had two children, a boy and a girl, from a previous marriage. Consistent with Tina's wishes, White agreed to adopt Tina's children, but Tina's first husband would not agree to terminate his parental rights. Sometime later, Tina petitioned a state court for an order of protection against her first husband, alleging that he had threatened to kill her and White and had physically abused her during their marriage. In a later deposition, Tina denied her first husband was ever violent with her. Likewise, White denies that he was ever threatened by Tina's first husband. In 1995, Tina's first husband ended his opposition to White's adoption and consented to terminate his parental rights. Tina told a friend she obtained her first husband's consent by threatening to charge him with child molestation. White adopted Tina's children in January 1996.

During his marriage to Tina, White was a CEO and major shareholder of a company making an initial public offering (IPO) of its stock. White's portion of the stock was worth approximately $400,000, and the IPO documents contained a provision that specified that all of White's stock would be transferred to Tina if White was ever convicted of a felony. Tina requested that White transfer half of the stock into her name, but he refused.

---

[1]The Honorable Nanette K. Laughrey, United States District Judge for the Western District of Missouri.

Tina and White's marriage deteriorated in 1997, leading to White's eventual expulsion from the home in September 1997. Tina and her children packed up White's belongings and put them outside with a note asking that he take his things and leave. When White came home he pounded his way through the door, which Tina had barricaded, and went to his bedroom. Tina contacted the Lee's Summit Police Department ("the police department") to report that her husband had broken through the door and shoved her down. The police arrived and arrested White.

White and Tina separated in October 1997, and Tina filed for divorce one month later. Thereafter, White and Tina temporarily reconciled and White moved back in for the sake of the children. At that time, White was beginning a new business with a potentially very profitable future. Tina worked for White's new company as a receptionist. The relationship soured again after Tina was seen looking through confidential payroll files. Afterwards, White limited Tina's access to the family's finances. White also asked a business associate to pay the family's bills and to give Tina a $1,500 per month allowance.

Two weeks later, Tina called the police department to accuse White of molesting her twelve year old daughter. Tina also filed for an order of protection and requested $6,165 in monthly child support and maintenance. Due to the accusations, White was forced to step down from his company and, when the divorce became final in December 1999, the divorce court awarded Tina all of White's shares in his previous company then valued at approximately $600,000.

Following the molestation accusation, an officer interviewed Tina's daughter and wrote an initial report. After that, the investigation was assigned to the department detective in charge of investigating sexual abuse allegations, defendant Richard McKinley. On March 25, 1998, Richard advised Tina by phone of his role in the investigation of her daughter's alleged molestation. Richard's case-file notes state that this phone call was his first contact with Tina, but the parties dispute whether this was

really Richard and Tina's first encounter. According to the children's nanny, Richard—already an acquaintance of Tina's—came to Tina's home in plain clothes after White's arrest in September 1997 and measured the damaged door. That incident occurred long before the molestation allegations surfaced.

Richard departed from his normal investigatory protocol in White's case. Richard seldom initially spoke with the child at the center of an abuse investigation, because that was normally the social worker's domain. White offered evidence that Richard met with Tina's daughter before the child met with the assigned social worker. During his interview with the alleged victim, Richard discussed the meaning of different sexual terms and asked Tina's daughter about viewing pornographic videos with her father. Richard took six pornographic videos from the house as evidence.

Richard also reviewed Tina's daughter's diary. The diary contained no entries related to the alleged sexual abuse, and Richard did not take the diary as evidence.[2] White sought the diary in discovery but never received it. White knew of the diary's existence because Tina had shown it to him when they were married. Tina had been upset that her daughter had written that Tina was not an affectionate mother. White had also read in the diary that Tina's daughter felt White was a good father and that the girl wanted to spend more time bonding with White at the family's lake house. When asked to produce the diary during White's first criminal trial, Tina told the prosecutor that it was lost. Tina's daughter, however, testified in a deposition that Tina had never asked her to look for it.

As part of the molestation investigation, Tina's daughter underwent a physical exam. The exam showed no physical signs of the type of molestation that she claimed

_____

[2]The diary was mentioned in one of Richard's initial reports. In a police report dated March 26, 1998, Richard wrote that "I asked [Tina's daughter] if she ever wrote any of the details down in her diary. [Tina's daughter] said that she hadn't because her mom knew where she kept her diary and didn't want her to find out that way."

had occurred within the prior three weeks. The report did indicate that the girl's description of abuse was consistent with other abuse cases. Richard later questioned Tina at her home for two hours without the children present as part of the investigation. Richard claimed he needed Tina to corroborate her daughter's account of abuse since there was no physical evidence of abuse, no confession of the abuser, and the allegations were being made within the context of a recently filed divorce—a time when false abuse accusations are common. Richard learned that Tina had taken notes about the abuse, and he took custody of those notes to corroborate her daughter's accusations. Tina also told Richard about other suspicious behavior of White towards her daughter that she had witnessed. Many of the incidents she discussed had not been mentioned by her daughter during her interview with the social worker.

Richard did not mention White and Tina's pending divorce in any of his police reports. He did not review any records or pleadings from the divorce proceedings even though he knew that abuse allegations during divorce were a "red flag." Richard did not interview White during his investigation despite White's attempts to make himself available. Richard had testified in an unrelated case that it is standard procedure for the lead investigator in a child molestation case to speak to the accused if they are willing to talk.[3]

In April 1998, while investigating the allegations against White, Richard developed strong romantic affection for Tina and asked her out. By that time, the prosecutor had filed charges against White, but Richard remained the lead investigator on the case. Tina and Richard began seeing each other in May, and the relationship

---

[3]The prosecutor during White's first trial, testified that a lead investigator is always supposed to attempt to interview the suspect. This prosecutor testified that if she had known Richard turned down an opportunity to interview White that would have "raised an eyebrow" about the detective's work. Because Richard did not interview White, he did not learn the names of the people White was with during the alleged events.

became sexual. Richard told his police chief that he was having an affair with Tina in June, and the chief urged him to stop the affair and to tell the prosecutor. Richard told the prosecutor that he and Tina had met for a single date. He did not disclose that their relationship was sexual or that he had any contact with Tina prior to the March 26th interview with Tina's daughter. The prosecutor, believing only one date had occurred, chose not to disclose Richard's relationship with Tina to the defense.

In the fall of 1998, the prosecutor first learned that Tina and Richard were actually having an on-going romantic relationship, as opposed to just having gone on one date, when they announced their engagement. Prior to Richard's January 1999 deposition, the prosecutor told Richard that he would need to answer questions about the affair truthfully. The prosecutor said he would cough to signal to Richard when he needed to disclose the affair in response to a question. Richard was asked if he had any personal interest in the case, during a deposition, and he stated he did not. The prosecutor did not signal him to say otherwise. Consequently, White never learned of Richard and Tina's affair before his first criminal trial.

A few months after White was convicted, Tina moved in with Richard. She then married Richard in July 2000. At that time, White learned that Tina and Richard had been having an affair at least during the trial and perhaps during the investigation. White also learned that the prosecutor knew about this. White appealed his conviction, and the Missouri Court of Appeals reversed, finding that the prosecutor violated his duty to disclose exculpatory evidence. White's conviction was retried on the same charges. During this second trial, Tina's son's testimony contradicted his mother's version of events, and the jury deadlocked eleven to one in favor of acquittal. The judge declared a mistrial.

White was prosecuted a third time, and, while the third trial was pending, White subpoenaed his adopted son as a defense witness. Before he could testify, however, Richard called a crisis counselor to report that Tina's son had disclosed that White had

molested him as well, and that the son was suicidal. The trial judge deemed Tina's son unavailable to testify, but allowed the son's testimony from the second trial to be read into record. The jury acquitted White on all counts after the third trial.

In the instant action against Richard and Tina, White's complaint alleged: malicious prosecution; false arrest; common law negligence; use of unreliable and fraudulent investigatory techniques and procurement of unreliable and fabricated evidence under 42 U.S.C. § 1983; conspiracy under § 1983; and suppression of exculpatory evidence under § 1983. Richard and Tina McKinley moved for summary judgment on all counts. The district court denied Richard's motion as to the conspiracy claim and the procedural due process claim and granted his motion in all other respects. Tina's motion was denied as to the conspiracy, false arrest, and malicious prosecution claims.

## II. *Discussion*

In this interlocutory appeal, Richard argues that the district court erred in denying summary judgment for White's procedural due process and conspiracy claims. Tina also appeals, asserting that the district court erred in denying her summary judgment motion for White's conspiracy, false arrest, and malicious prosecution claims.

### A. *Richard's Appeal*
#### 1. *Subject Matter Jurisdiction*

We first address our jurisdiction. White argues that we do not have subject matter jurisdiction over this interlocutory appeal from a denial of summary judgment. We disagree. Although Richard's appeal may resemble an attack on the sufficiency of the evidence, the appeal also asks the purely legal question whether White has shown the existence of a clearly established constitutional right.

"A defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a genuine issue of fact for trial"; the appealable issue is the purely legal one. *Johnson v. Jones*, 515 U.S. 304, 319–20 (1995). This court does not have jurisdiction to consider an interlocutory summary-judgment qualified-immunity appeal if "at the heart of th[e] argument is a dispute of fact." *Pace v. City of Des Moines*, 201 F.3d 1050, 1053 (8th Cir. 2000). Even if a defendant frames an issue in terms of qualified immunity, we should determine whether he is simply arguing that the plaintiff offered insufficient evidence to create a material issue of fact. *Thomas v. Talley*, 251 F.3d 743, 747 (8th Cir. 2001). Typically, the appealable issue is whether the federal right allegedly infringed was "clearly established." *Id*. at 746–47 (internal citation and quotations omitted).

In addition to some evidentiary arguments, Richard's appeal mainly asks whether he is entitled to qualified immunity for failing to seize a diary containing potentially exculpatory evidence and for failing to disclose his intimate relationship with the ex-wife of the accused who was also the mother of the alleged victim. Richard argues that White possessed no clearly established federal constitutional right infringed by Richard's failures. Given the limited nature of that question, we have subject matter jurisdiction over his appeal.

## 2. *Procedural Due Process*

Richard first argues that the district court erred in denying his motion for summary judgment on the procedural due process claims based on denial of qualified immunity. We review de novo the district court's denial of qualified immunity. *Clemmons v. Armontrout*, 477 F.3d 962, 965 (8th Cir. 2007).

"To determine whether an official is entitled to qualified immunity we engage in a two-part analysis. The "threshold question" is whether, taking the facts in the light most favorable to the injured party, the alleged facts demonstrate that the official's

conduct violated a constitutional right." *Id*. If a violation could be made out on a favorable view of the parties' alleged facts, the next step is to ask whether the right was clearly established. *Id*. "To determine whether a right is clearly established we ask whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*.

The party asserting immunity always has the burden to establish the relevant predicate facts, and at the summary judgment stage, the nonmoving party is given the benefit of all reasonable inferences. *Pace,* 201 F.3d at 1056. If there is a genuine dispute concerning predicate facts material to the qualified immunity issue, the defendant is not entitled to summary judgment. *Id*. The threshold question then is whether, viewed in the light most favorable to White, the facts as alleged demonstrate that Richard's conduct violated a constitutional right.

The constitutional right implicated by the instant facts is explained in *Brady v. Maryland*: "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of prosecution." 373 U.S. 83, 87 (1963). The Supreme Court stated in *California v. Trombetta*, with respect to the Due Process Clause of the Fourteenth Amendment: "We have long interpreted this standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense. To safeguard that right, the Court has developed what might loosely be called the area of constitutionally guaranteed access to evidence."467 U.S. 479, 485 (1984).

The right *Brady* describes definitely applies to prosecutors and imposes upon them an absolute disclosure duty. But, *Brady's* protections also extend to actions of other law enforcement officers such as investigating officers. However, an investigating officer's failure to preserve evidence potentially useful to the accused or their failure to disclose such evidence does not constitute a denial of due process in

the absence of bad faith. *Villasana v. Wilhoit*, 368 F.3d 976, 980 (8th Cir. 2004). "[T]he recovery of § 1983 damages requires proof that a law enforcement officer other than the prosecutor intended to deprive the defendant of a fair trial." *Id*. Consequently, to be viable, White's claim must allege bad faith to implicate a clearly established right under *Brady*.

Upon review, we agree with the district court that the facts alleged here meet the bad faith standard. Treating the facts as alleged to be true, a reasonable juror could find Richard deprived White of a fair trial in bad faith by deliberately steering the investigation to benefit his love interest, Tina. Richard deliberately withheld from prosecutors the full extent of his relationship with Tina and failed to preserve the alleged victim's diary which did not corroborate the molestation allegations. Failing to preserve the diary deprived White of his right to a fair trial, in part, because he could not testify about the diary without waiving his right not to testify. Whether Richard's failure to disclose the full extent of his relationship with Tina and preserve the diary were done in bad faith are disputed factual questions inappropriate for summary judgment.

Richard argues that the *Brady*-derived right alleged was not clearly established and that there are no cases factually similar that would have put him on notice of White's rights. However, we have held that "the absence of a factually similar case does not guarantee government officials the shield of qualified immunity. . . . [t]he key inquiry in deciding whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Moran v. Clark*, 359 F.3d 1058, 1060–61 (8th Cir. 2004) (internal citations and quotations omitted). We hold that no reasonable police officer in Richard's shoes could have believed that he could deliberately misrepresent the nature and length of his relationship with Tina, or that he could deliberately fail to preserve a child victim's diary containing potentially exculpatory information.

-10-

Because Richard is asserting the qualified immunity defense, he has the burden to establish the relevant predicate facts for its application. He has not done so. During this review, we are limited to the facts as alleged by the plaintiff. Given these facts, a reasonable juror could find that Richard deliberately misrepresented his relationship with Tina and that he deliberately failed to preserve the diary in bad faith. Therefore, we find no error in the district court's denial of qualified immunity for White's due process claim.

### 3. *Conspiracy*

Richard also appeals the denial of summary judgment on White's conspiracy claim. White alleged Richard and Tina conspired to deprive him of his constitutional rights. To prove a 42 U.S.C. § 1983 conspiracy claim, a plaintiff must show: (1) that the defendant conspired with others to deprive him of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured the plaintiff. *Askew v. Millerd*, 191 F.3d 953, 957 (8th Cir. 1999). The plaintiff is additionally required to prove a deprivation of a constitutional right or privilege in order to prevail on a § 1983 civil conspiracy claim. *Id.*

Richard argues that the conspiracy claim fails because he did not violate any of White's constitutional rights, and absent a constitutional violation, there is no actionable conspiracy claim. However, the district court found that because it denied summary judgment on the procedural due process claim, the court could not grant summary judgment on McKinley's conspiracy claim. We agree. The determination that a constitutional violation could be proven on the due process claim also defeats Richard's qualified immunity defense at this stage for the conspiracy claim.

## B. *Tina's Appeal*

Tina also filed an interlocutory appeal, arguing that the district court erred in denying her summary judgment motion as to the conspiracy, false arrest and malicious prosecution claims.

### 1. *False Arrest and Malicious Prosecution*

As with Richard, we must first address our jurisdiction. White argues that we do not have pendent jurisdiction to review the district court's ruling on White's false arrest and malicious prosecution claims against Tina in this interlocutory appeal. This time, we agree.

The interlocutory appeal for denial of qualified immunity is a vehicle with limited capacity and cannot accommodate other interlocutory appellate arguments unless they are "inextricably intertwined" with the defense of qualified immunity. *Eagle v. Morgan*, 88 F.3d 620, 628 (8th Cir. 1996). When a ruling on the merits resolves the non-government individual's pendent claims, that individual's appeal is "inextricably intertwined" with the officer's qualified immunity. *Id*. An interlocutory appeal is not inextricably intertwined with the question of qualified immunity if the resolution of the two issues requires entirely different analysis. *Veneklase v. City of Fargo*, 78 F.3d 1264, 1270 (8th Cir. 1996). White's false arrest and malicious prosecution claims against Tina would be inextricably intertwined with Richard's interlocutory appeal if our ruling on the merits of Richard's qualified immunity appeal resolved all of the remaining issues presented by Tina's pendent appeal.

Our ruling on Richard's qualified immunity, however, does not resolve White's claims against Tina. For Tina to be found guilty of maliciously causing false prosecution, White must prove (1) the commencement of a prosecution against the plaintiff; (2) its legal causation or instigation by the defendant; (3) its termination in favor of the plaintiff; (4) want of probable cause by the prosecution; (5) defendant's conduct was actuated by malice; and (6) plaintiff was damaged. *Duvall v. Lawrence*,

86 S.W.3d 74, 84 (Mo. App. 2002). To be found guilty under a theory of false arrest, the evidence must show White was confined against his will and without legal justification. *Rankin v. Venator Group Retail, Inc.*, 93 S.W.3d 814, 819 (Mo. App. 2002). Tina may be liable for false arrest even if she did not actually confine White, if she provided information that formed the basis of the false arrest. *Id*. These issues would not be resolved in Tina's favor on the basis of our merits ruling on Richard's qualified immunity appeal. The facts and legal arguments related to Richard's qualified immunity and Tina's false imprisonment and malicious prosecution claims are not inextricably intertwined. Consequently, we do not have jurisdiction to hear Tina's appeal regarding the false arrest and malicious prosecution claims.

### 2. *Conspiracy*

We do, however, have jurisdiction over Tina's appeal of the denial of summary judgment as it relates to the 42 U.S.C. § 1983 conspiracy claim. Although § 1983 can only be used to remedy deprivation of rights done under the color of law, a private actor can be liable "under § 1983 for conspiring with state officials to violate a private citizen's right[s]. . . . " *Dossett v. First State Bank*, 399 F.3d 940, 950 (8th Cir. 2005). The key inquiry is whether the private party was a willful participant in the corrupt conspiracy. *DuBose v. Kelly*, 187 F.3d 999, 1003 (8th Cir. 1999).

For a claim of conspiracy under Section 1983, the plaintiff need not show that each participant knew "the exact limits of the illegal plan. . . ," but the plaintiff must show evidence sufficient to support the conclusion that the defendants reached an agreement to deprive the plaintiff of constitutionally guaranteed rights. *Larson by Larson v. Miller*, 76 F.3d 1446, 1458 (8th Cir. 1996). "The question of the existence of a conspiracy to deprive the plaintiffs of their constitutional rights should not be taken from the jury if there is a possibility the jury could infer from the circumstances a 'meeting of the minds' or understanding among the conspirators to achieve the conspiracy's aims." *Id*. Because "the elements of a conspiracy are rarely established through means other than circumstantial evidence, and summary judgment is only

warranted when the evidence is so one-sided as to leave no room for any reasonable difference of opinion as to how the case should be decided. The court must be convinced that the evidence presented is insufficient to support any reasonable inference of a conspiracy." *Westborough Mall, Inc. v. City of Cape Girardeau*, 693 F.2d 733, 743 (8th Cir. 1982).

Tina argues that the district court erred in denying her motion for summary judgment on this conspiracy claim because the facts that the court relied on are not sufficient to support a conspiracy claim. We disagree. Viewing the facts in a light most favorable to White, a reasonable juror could find that Tina and Richard reached a meeting of the minds to withhold exculpatory evidence from prosecutors and White. White offers evidence that Tina and Richard were romantically involved shortly after White was accused, and there is also evidence that Tina and Richard knew each other before the abuse allegations even surfaced. Some evidence suggests that Richard reviewed and returned the potentially exculpatory diary to Tina and that the diary then disappeared. There is also evidence that Tina stood to gain financially from White's conviction. Because the elements of conspiracy are rarely established through means other than circumstantial evidence, and here there is sufficient evidence to support a reasonable inference of conspiracy, summary judgment was not appropriate.

### III. *Conclusion*

For the foregoing reasons, the judgment of the district court is affirmed.

_____