# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-3422

_____

Dale Helmig

*Plaintiff - Appellant*

v.

Carl A. Fowler

*Defendant - Appellee*

Robert J. Westfall

*Defendant*

Paul Backues; Osage County, MO

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Western District of Missouri - Jefferson City

_____

Submitted: November 17, 2015
Filed: July 11, 2016

_____

Before COLLOTON, GRUENDER, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

In March 1996, Dale Helmig ("Helmig") was convicted by a jury in the Circuit Court of Gasonade County, Missouri of the first-degree murder of his mother, Norma Helmig. The conviction was affirmed. State v. Helmig, 950 S.W.2d 649 (Mo. Ct. App. 1997). Post-conviction relief was denied, and the denial was affirmed. Helmig v. State, 42 S.W.3d 658 (Mo. Ct. App. 2001). In 2009 Helmig sought habeas relief in state court, and in 2011 the Missouri Court of Appeals vacated his conviction and gave the State 180 days to retry him. State ex rel. Koster v. McElwain, 340 S.W.3d 221, 258 (Mo. Ct. App. 2011). The State declined to retry Helmig. Helmig then filed suit in federal court against law enforcement officers and Osage County, Missouri under 42 U.S.C. § 1983, alleging that they violated his constitutional right to due process by not disclosing certain materially favorable evidence, fabricating evidence, and conspiring to misuse evidence. The district court[1] granted summary judgment to the officers and Osage County. Helmig appeals, and we affirm.

I.

Norma Helmig ("Norma") was murdered in July 1993. At the time of her death, Norma was separated and in the process of getting a divorce from Ted Helmig ("Ted"), Appellant Dale Helmig's father. On occasion, Dale Helmig spent the night at his mother's home in Pointer's Creek, Missouri.

Norma was away from her home on the evening of Wednesday, July 28, 1993, and returned home sometime in the early morning hours on Thursday, July 29, 1993. On Wednesday, July 28, 1993, Helmig was working in Holt's Summit, Missouri. Because roads were closed due to flooding, Helmig checked into a hotel in Fulton,

---

[1]The Honorable Nanette K. Laughrey, United States District Judge for the Western District of Missouri.

Missouri. On Thursday, July 29, 1993, Helmig spent the night with Stacey Medlock at a motel in Eldon, Missouri. He tried to call his mother on Thursday, but Norma never answered.

On Friday, July 30, 1993, Helmig drove with Medlock to his mother's home around noon. When he discovered that his mother was not home, Helmig called the police. Osage County Deputy Sheriff Paul Backues was dispatched to the house. Helmig told Deputy Backues that he had recently been staying with his mother but had been gone for several days for work. He showed Deputy Backues some things that were out of order, and Deputy Backues called Osage County Sheriff Carl Fowler to the scene. Helmig mentioned to Deputy Backues that Helmig had visitation with his two children the next day, Saturday, July 31, 1993. Deputy Backues told Helmig that his children should not be at Norma's house while the search was ongoing.

Sheriff Fowler and Deputy Backues were still at the house when Helmig and Medlock left. As they drove away, Medlock thought Helmig seemed worried. He told Medlock, "Someone must have gotten crazy drunk and killed her."

On Saturday, July 31, 1993, the police conducted an aerial search around Norma's home. Helmig was not present during the search. Norma's body was found in a nearby river on Sunday, August 1, 1993. An expert later determined that the time of death was probably between 4:00 a.m. and 6:00 a.m. on Thursday, July 29, 1993, and that asphyxiation was the likely cause of death.

In March 1994, Helmig was arrested and charged with his mother's murder. Helmig was tried by a jury in March 1996. The state's case rested entirely upon circumstantial evidence. Sheriff Fowler and Deputy Backues were among the State's witnesses.

Prior to trial, Sheriff Fowler, the prosecution, and Helmig's attorney were aware that Norma and Ted were in a divorce proceeding. They were also aware that Norma had taken the following actions: accused Ted of physical abuse, inquired of Sheriff Fowler about a gun, been in contact with Sheriff Fowler about her divorce, and caused a temporary restraining order to be issued and served on Ted.

At trial, Sheriff Fowler testified that Norma and Ted were going through a divorce, he served the divorce papers on Ted, and Norma had contacted the sheriff's office "on a number of occasions" about the divorce situation. Sheriff Fowler further testified that he served a temporary restraining order on Ted as part of the divorce, and Norma was concerned about the restraining order. He explained that a restraint against physical threats was "pretty much a given" in such an order. Sheriff Fowler also acknowledged that he had received a police report with respect to an incident in which Ted threw coffee at Norma at the Country Kitchen restaurant and told her, "I'm going to have to end this once and for all."

On the second day of the jury trial, Prosecuting Attorney Robert Schollmeyer learned of a report of an altercation between Appellant Dale Helmig and Norma at the Country Kitchen. Schollmeyer shared the information with Sheriff Fowler, Helmig's counsel, and the court. Sheriff Fowler was not previously aware of this report. On the State's re-direct examination of Sheriff Fowler, he was asked whether he had become aware of the altercation between Dale Helmig and his mother, to which Sheriff Fowler answered, "Yes." Fowler was not asked by the state or by Helmig's attorney whether the report was factual.

Neither the prosecution nor the defense questioned Deputy Backues about whether he had suggested that Helmig stay away from Norma's house during the search. However, in closing arguments, the prosecution suggested that Helmig was absent during the police investigation because he was guilty of murder.

On March 9, 1996, the jury found Helmig guilty of first degree murder, and subsequently he was sentenced to life in prison without parole. The conviction was affirmed. See Helmig, 950 S.W.2d at 649. After several unsuccessful petitions for post-conviction relief, the Missouri Court of Appeals concluded in 2011 that Helmig had been deprived of a fair trial, vacated his conviction, and ordered the State to retry him for the murder of Norma within 180 days or discharge him from the State's custody. See Koster, 340 S.W.3d at 258. The Osage County prosecutor decided not to retry Helmig, and Helmig was discharged.

Helmig filed this § 1983 action against Missouri State Trooper Robert J. Westfall,[2] Sheriff Fowler, Deputy Backues, and Osage County. Helmig alleged that Sheriff Fowler and Deputy Backues violated Brady,[3] fabricated evidence and conspired to withhold and fabricate evidence against Helmig, and that Defendants Osage County and Sheriff Fowler failed to establish appropriate policies and adequately train law enforcement personnel. See Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978) (holding that a local government may be sued under § 1983 when an official policy is "the moving force of the constitutional violation"). Helmig further asserted that Sheriff Fowler and Deputy Backues committed false arrest and engaged in malicious prosecution.

The district court granted summary judgment in Defendants' favor on all of Helmig's claims. Helmig only appeals the district court's grant of summary judgment on his § 1983 conspiracy, fabrication of evidence, and failure to disclose exculpatory evidence claims against Sheriff Fowler and Deputy Backues.[4]

---

[2]The claims against Westfall were previously dismissed with prejudice, on Helmig's motion.

[3]Brady v. Maryland, 373 U.S. 83 (1963).

[4]The district court found that Helmig's Monell claim failed because Helmig could point to no policy, practice, or custom that was the moving force behind the

II.

We review a district court's grant of a motion for summary judgment de novo, viewing all evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party. Inechien v. Nichols Aluminum, LLC, 728 F.3d 816, 819 (8th Cir. 2013). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A.

Helmig claims that Sheriff Fowler intentionally violated his constitutional rights under Brady and is therefore liable under § 1983. In Brady, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Brady extends to the actions of other law enforcement officers, including investigating officers, but an investigating officer's failure to disclose exculpatory evidence does not constitute a Brady violation in the absence of bad faith. White v. McKinley, 519 F.3d 806, 814 (8th Cir. 2008); see also Villasana v. Wilhoit, 368 F.3d 976, 980 (8th Cir. 2004) (concluding that the recovery of § 1983 damages for a Brady violation "requires proof that a law enforcement officer other than the prosecutor intended to deprive the defendant of a fair trial"). "Materially favorable evidence includes both exculpatory and impeachment evidence." Villasana, 368 F.3d at 978 (citing United States v. Bagley, 473 U.S. 667, 676 (1985)). Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682. It is

violation of his rights. Helmig does not appeal the district court's grant of summary judgment in favor of Defendants Osage County and Sheriff Fowler on his Monell claim.

-6-

undisputed that Helmig requested, pretrial, all exculpatory evidence and information possessed by the state.

Helmig alleges that Sheriff Fowler and Deputy Backues failed to disclose to Helmig and his attorney that Norma had contacted Fowler five to fifteen times out of fear of harm at the hands of Ted Helmig, that she inquired about obtaining a gun and that the reported altercation at the Country Kitchen restaurant was unsubstantiated.

We first address Helmig's claim that Sheriff Fowler violated <u>Brady</u> by failing to reveal, pre-trial, that the Country Kitchen altercation was fabricated. First, it is undisputed that Sheriff Fowler learned of this reported altercation at the same time as did Helmig's attorney and the trial court – when the prosecutor disclosed this information during the trial and prior to Sheriff Fowler's testimony. During his testimony, Sheriff Fowler answered questions asked by the state and by Helmig's attorney, and affirmed that he had become aware of such an incident. Presumably, had Sheriff Fowler been asked, he would have affirmed that the reported altercation was just that, a report. Because Sheriff Fowler had no pre-trial knowledge of this report and did not learn that the report was unsubstantiated until after the trial, he can have no liability under <u>Brady</u>. Further, insofar as this claim is based upon Sheriff Fowler's alleged omission from his trial testimony that the alleged altercation between Helmig and Norma at the Country Kitchen was unsubstantiated, Fowler is protected by absolute immunity. <u>See</u> <u>Briscoe v. LaHue</u>, 460 U.S. 325, 343 (1983) (a law enforcement officer who serves as a trial witness enjoys absolute immunity from any civil claim premised on his testimony).

Helmig also contends that Sheriff Fowler's failure to disclose to the defense that Norma contacted him five to fifteen times about her fear of Ted constitutes a <u>Brady</u> violation. At the criminal trial, when asked how many times he had spoken to Norma regarding her "divorce situation," Sheriff Fowler testified that Norma had contacted his office "on a number of occasions" but he did not recall the specific number of

times he spoke with her about her divorce. Five to fifteen times is consistent with "a number of occasions." Thus, the evidence of the five to fifteen contacts is cumulative of Sheriff Fowler's testimony at trial, and no Brady violation occurred. See United States v. Zuazo, 243 F.3d 428, 431 (8th Cir. 2001) (noting that the government does not violate Brady when undisclosed evidence is cumulative of other evidence already available to the defendant).

Further, Sheriff Fowler has never indicated that Norma contacted him five to fifteen times in which she told him that she *feared Ted* – he testified in a deposition in the instant action that she contacted him five to fifteen times about Ted disposing of marital property before the divorce was finalized. Sheriff Fowler was deposed on December 11, 1998 after Helmig filed a Missouri Rule of Criminal Procedure 29.15 motion for post-conviction relief. Sheriff Fowler was asked whether Norma had reported that she was being abused by Ted, to which Sheriff Fowler replied, "I don't recall our specific conversations. I know that she - - she expressed some concerns. I don't recall specific allegations of abuse, but there may have been. I know - - I know she had some concerns, yes." When pressed further about whether Norma's concerns were for her safety, Sheriff Fowler stated, "I believe there were some safety concerns, yes." Subsequently, in a deposition in this case, Sheriff Fowler attempted to clarify that he never had a specific conversation with Norma where she expressed fear that someone was going to hurt her. He indicated that as sheriff, when someone approaches him for help, "it generally has to do with how they can make their life more safe," and therefore he would refer to that inquiry as a "safety concern." Further, in a 2010 habeas proceeding, Sheriff Fowler testified that Norma had spoken with him about a gun and that "it was very obvious that [Norma and Ted] were in a rocky domestic relationship." He also stated that the domestic troubles were "not unusual in a separation."

We find no Brady violation with respect to information as to the number or nature of Norma's contacts with Sheriff Fowler. Helmig's attorney was aware, pre-

trial, of Ted's physical abuse of Norma, the temporary restraining order in effect against Ted, and Norma's contact with Sheriff Fowler with respect to a gun. See United States v. Jones, 34 F.3d 596, 600 (8th Cir. 1994) ("When information is readily available to the defendant, it is not Brady material, and the prosecution does not violate Brady by not . . . disclosing the information.") (citations omitted). Information as to any safety concerns by Norma would be merely cumulative of this more direct evidence. See Zuazo, 243 F.3d at 431. Moreover, nothing in the record suggests that Sheriff Fowler or Deputy Backues failed to turn over exculpatory evidence to the prosecution, which normally discharges the duty of law enforcement officers under Brady. See White, 519 F.3d at 814 (acknowledging the "Brady-derived" responsibility of police officers to disclose exculpatory evidence to prosecutors); Walker v. City of New York, 974 F.2d 293, 299 (2d Cir. 1992) (recognizing that although Brady did not delineate the relative disclosure obligations of the police and the prosecution, subsequent cases "have suggested that the police satisfy their obligations under Brady when they turn exculpatory evidence over to the prosecutors") (citations omitted); see also Moldowan v. City of Warren, 578 F.3d 351, 381 (6th Cir. 2009) (listing cases from several circuits that held police officers fulfill their Brady obligations by turning over exculpatory evidence to prosecutors).

Furthermore, recovery of § 1983 damages from a law enforcement officer for a Brady violation requires the intentional or bad faith failure to disclose Brady evidence to the prosecutor or the defense. Villasana, 368 F.3d at 980. That is, the law enforcement officer must have "engaged in 'a conscious effort to suppress exculpatory evidence.'" Id. (quoting California v. Trombetta, 467 U.S. 479, 488 (1984)). Here, Helmig has presented no evidence that Sheriff Fowler acted in bad faith or intended to suppress evidence of Norma's safety concerns and deprive Helmig of a fair trial. Unlike in the criminal context where a prosecutor is responsible for failing to produce materially favorable evidence regardless of fault, § 1983 civil liability for a Brady violation by a law enforcement officer requires intentional suppression or bad faith. Id. Without any evidence of intent or bad faith, Helmig's claim must fail.

Additionally, it is worth noting that Helmig's attorney's overall defense strategy at trial did not hinge on Ted's abuse of Norma or Norma's fear of Ted. Instead, Helmig's counsel pursued the theory that Norma died of natural causes or an accidental drug overdose and the State had not proved Norma's death was the result of murder.

For the aforementioned reasons, Helmig's proof does not support a viable § 1983 claim under Brady.

B.

Helmig asserts that Sheriff Fowler fabricated testimony of the allegedly non-existent Country Kitchen altercation between Norma and Helmig. However, as we have explained, Sheriff Fowler learned of this report at the same time as Helmig's attorney, and Sheriff Fowler's lack of testimony at trial about his limited knowledge of the report when he was never asked about whether the report was or was not substantiated both fails to support a Brady claim and is protected by absolute immunity. See Briscoe, 460 U.S. at 343.

C.

Helmig asserts that Sheriff Fowler and Deputy Backues participated in a conspiracy to deny him a fair trial. He recasts some of his arguments regarding Brady violations to support his conspiracy claim. For example, Helmig alleges that the overt acts in furtherance of the conspiracy include Sheriff Fowler's failure to disclose Norma's five to fifteen contacts with him and Fowler's failure to disclose that reports of the altercation between Dale Helmig and Norma were unsubstantiated.

To prove a § 1983 conspiracy claim, the plaintiff must show that the defendant (1) conspired with others to deprive him or her of a constitutional right; (2) at least

-10-

one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) the overt act injured the plaintiff. Askew v. Millerd, 191 F.3d 953, 957 (8th Cir. 1999). "[T]he plaintiff need not show that each participant knew the exact limits of the illegal plan, but the plaintiff must show evidence sufficient to support the conclusion that the defendants reached an agreement to deprive the plaintiff of constitutionally guaranteed rights." White, 519 F.3d at 816 (internal quotation marks and citation omitted). "The question of the existence of a conspiracy to deprive the plaintiffs of their constitutional rights should not be taken from the jury if there is a possibility the jury could infer from the circumstances a meeting of the minds or understanding among the conspirators to achieve the conspiracy's aims." Id. (internal quotation marks and citation omitted). Because the elements of a conspiracy are generally proved by circumstantial evidence, summary judgment should only be granted where "the evidence is so one-sided as to leave no room for any reasonable difference of opinion as to how the case should be decided." Burton v. St. Louis Bd. of Police Comm'rs, 731 F.3d 784, 799 (8th Cir. 2013) (quoting Westborough Mall, Inc. v. City of Cape Girardeau, Mo., 693 F.2d 733, 743 (8th Cir. 1982)). "The court must be convinced that the evidence presented is insufficient to support any reasonable inference of a conspiracy." Id. (quoting Westborough Mall, 693 F.2d at 743).

Helmig's conspiracy claim fails because he has not presented evidence of an agreement between Defendants to deprive him of a fair trial. "To advance past the summary judgment stage, [Helmig] must allege with particularity and specifically demonstrate material facts that the defendants reached an agreement." Reasonover v. St. Louis Cnty., Mo., 447 F.3d 569, 582 (8th Cir. 2006) (internal quotation marks and citation omitted) (affirming grant of summary judgment on plaintiff's § 1983 claim where plaintiff presented "no specific material facts, circumstantial or otherwise, that the officers formed an agreement to violate [the plaintiff's] constitutional rights"). Viewing the evidence in a light most favorable to Helmig, no reasonable juror could infer the existence of a conspiracy to deprive Helmig of a fair trial. Accordingly, we

-11-

find that the district court properly granted summary judgment in favor of Sheriff Fowler and Deputy Backues on Helmig's § 1983 conspiracy claim.

## III.

For the foregoing reasons, we affirm the judgment of the district court.

_____