# United States Court of Appeals
## For the Eighth Circuit

_____

No. 17-1309

_____

Michael James Holmes

*Plaintiff - Appellee*

v.

Mayor Francis G. Slay, In his official capacity as a member of the Board of Police Commissioners of the St. Louis Metropolitan Police Department.; Bettye Battle-Turner, In her official capacity as a member of the Board of Police Commissioners of the St. Louis Metropolitan Police Department; Col. Richard Gray, In his official capacity as a member of the Board of Police Commissioners of the St. Louis Metropolitan Police Department.; Chief Jerome D. Lee, In his official capacity as a member of the Board of Police Commissioners of the St. Louis Metropolitan Police Department.; Col. Thomas Irwin, In his official capacity as a member of the Board of Police Commissioners of the St. Louis Metropolitan Police Department.

*Defendants*

Bobby Lee Garrett, In his official capacity as a member of the Board of Police Commissioners of the St. Louis Metropolitan Police Department and individually; Shell Sharp, In his official capacity as a member of the Board of Police Commissioners of the St. Louis Metropolitan Police Department, and individually.

*Defendants - Appellants*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: January 11, 2018
Filed: July 10, 2018
_____

Before LOKEN, GRUENDER, and KELLY, Circuit Judges.
_____

KELLY, Circuit Judge.

In 2006, Michael Holmes was convicted of possession of crack cocaine with intent to distribute and possession of firearms in furtherance of a drug trafficking crime. We affirmed those convictions on appeal. United States v. Holmes (Holmes I), 231 F. App'x 535 (8th Cir. 2007) (per curiam). However, Holmes's story did not end there. Bobby Garrett and Shell Sharp, two of the officers involved in the arrest and prosecution of Holmes, were investigated for repeated misconduct.[1] See Holmes v. United States (Holmes II), No. 4:08-CV-1142, 2011 WL 4445702, at *3 (E.D. Mo. Sept. 26, 2011). Garrett was federally prosecuted, and Sharp resigned from the St. Louis Metropolitan Police Department (MPD). Holmes then filed a motion under 28 U.S.C. § 2255 seeking to vacate, set aside or correct his sentence. The district court granted the motion to vacate because "the witnesses [Garrett and Sharp] ha[d] now been discredited and the government would not have been able to meet its burden of proof with the remaining evidence." Id. The government elected not to retry the case, and the indictment was dismissed. Holmes then sought a certificate of innocence under 28 U.S.C § 2513 and, simultaneously but separately, filed the instant case suing Garrett and Sharp—among others—under 42 U.S.C. § 1983. The district court denied Holmes's a certificate of innocence because, it concluded, he "ha[d] not met his burden of proving actual innocence." Holmes v. United States (Holmes III),

_____

[1]None of the misconduct discovered in the investigation was directly related to the case against Holmes.

-2-

No. 4:08-CV-1142, 2015 WL 6702269 at *3 (E.D. Mo. Nov. 3, 2015), appeals pending, Nos. 16-1078 & 17-2583 (8th Cir. argued Mar. 14, 2018).

In the instant case—in which Holmes alleges conspiracy to violate his civil rights under § 1983, and malicious prosecution and false imprisonment under Missouri law—the district court[2] dismissed all claims against members of the Board of Police Commissioners of the MPD based on pre-trial motions, but allowed the claims against Garrett and Sharp (collectively, the officers) to proceed to trial. On March 4, 2016, the jury returned a verdict in favor of Holmes on all counts and awarded him $2.5 million. The officers now appeal. They argue that the district court abused its discretion in excluding the facts and circumstances of Holmes's prior, unrelated drug trafficking conviction and admitting testimony by his expert witnesses. They also assert that they were entitled to judgment as a matter of law on certain claims and that the district court erred when instructing the jury.

## I.

On December 9, 2003, Holmes was present at 5894 Cates Avenue in St. Louis, Missouri, when the police searched the house and arrested him. At trial in this case, the parties gave divergent accounts of what happened that day.[3]

---

[2]The Honorable Henry E. Autrey, United States District Judge for the Eastern District of Missouri. All prior references to "the district court" refer to the court in Holmes's criminal case and collateral proceedings, presided over by other United States District Judges for the Eastern District of Missouri.

[3]As noted below, in reviewing the officers' sufficiency of the evidence arguments, we view the evidence in the light most favorable to the verdict. However, because those are not the only claims present, we also briefly summarize the officers' account of what happened on December 9, 2003.

-3-

### a. Holmes's Account

Michael Holmes woke up at the house he shared with his fiancée in Ferguson, Missouri. He prepared breakfast and dropped the kids off at school before going to do volunteer work for a local music group. However, he got a phone call from his cousin asking him to meet up in St. Louis, so he headed instead to the house at 5894 Cates Avenue, where his grandmother lived. She had also previously owned the home. Holmes knew the house well because he too had lived there (with his mother) on two separate occasions, but he had not resided at 5894 Cates Avenue since February 2002. Holmes, therefore, had no belongings at the house. When he arrived, Holmes went to the third floor and visited with his uncle, his cousins, and his cousins' friends. He also spent some time with his grandmother downstairs.

While Holmes was there, MPD conducted a search of the house. Holmes was using the third-floor bathroom when he heard footsteps coming up the stairs. When he walked out of the bathroom, he "ran straight into a police officer." The officer placed him under arrest and handcuffed him, as other officers came up the stairs. Holmes was taken to the police station where he was questioned—first by Sharp and then by Garrett—and released after he signed a property release form stating that none of the items seized from the house belonged to him. He was told that he should never go back to that house, but that, by signing the form and indicating that he had nothing to do with anything found in the house, that "was the end of it all." Two weeks later, Holmes was pulled over for a routine traffic stop and arrested on a warrant related to the search at 5894 Cates Avenue.

### b. Sharp & Garrett's Account[4]

---

[4]Sharp and Garrett also testified at Holmes's criminal trial in 2006, but this account is drawn from testimony in the instant § 1983 case.

On that same morning, Sharp received a tip about potential drug activity at 5894 Cates Avenue. Sharp and his partner, Alan Ray, sought aid in conducting surveillance because they were in uniform at the time. Garrett, an undercover officer with the narcotics unit at the time, was assigned to help them. Sharp and Garrett knew each other, having worked together in the past. They drove to Cates Avenue in Garrett's unmarked vehicle. Over the course of their hour-long stake-out, they witnessed multiple hand-to-hand drug transactions conducted by a man in a yellow tracksuit whom they later identified as Holmes. The officers met with supervisors and other officers at a nearby location to discuss the results of the surveillance, and then returned to the house. Holmes's grandmother answered the door when they knocked, and she consented to the search.

Once inside the house, Sharp saw the same man he had seen outside the house (Holmes) coming down the stairs holding a brown paper bag. When the man saw the officers, he dropped the paper bag and fled up the stairs to the third floor, where he was apprehended. Sharp seized the bag, which contained two clear plastic baggies containing a white, rock-like substance that he believed to be crack cocaine. Also in the house, officers recovered a shotgun, a rifle, glass test tubes, a roasting pan, more plastic baggies and rubber bands, a digital scale, an ounce of heroin, and some mail addressed to Holmes. Holmes was removed from the residence in handcuffs and taken to the police station where Sharp booked him. After Holmes was released, Sharp obtained a warrant for his arrest. Holmes was ultimately indicted by a federal grand jury on drug and firearms charges. He was tried and convicted in June 2006.

### c. 2016 Trial

At trial in this case, Holmes, Sharp, and Garrett all testified at length and were subjected to substantial cross-examination. The jury also heard testimony from a number of other witnesses: Hal Goldsmith, the former Assistant U.S. Attorney who prosecuted Garrett; the MPD internal affairs officer who investigated Sharp; two

former MPD officers who had been involved in Holmes's December 9, 2003, arrest; a clinical psychologist who had treated Holmes for trauma; and Dr. Angela Wingo, an expert in the field of police practices.[5]

## II.

Garrett and Holmes allege two evidentiary errors at trial. We review such rulings by the district court deferentially, and will reverse only "if there was a clear and prejudicial abuse of discretion." Der v. Connolly, 666 F.3d 1120, 1130 (8th Cir. 2012) (quotation omitted). "To warrant reversal, an error must affect a substantial right of the objecting party, and the burden of showing prejudice rests on that party." Vasquez v. Colores, 648 F.3d 648, 652 (8th Cir. 2011) (quotation omitted).

### a. Holmes's 1995 arrest and 1996 conviction

The officers argue the district court erred in excluding evidence relating to Holmes's 1995 arrest—and his related 1996 Alford plea—on a drug trafficking offense. Garrett was the arresting officer for that offense and testified about it during the trial for Holmes's now-vacated 2003 offense. There, Garrett had also testified that Holmes "admitted that he was a drug dealer" who sold cocaine. On appeal, we found no error in the admission of that testimony. Holmes I, 231 F. App'x at 536 ("[T]he district court did not abuse its discretion in denying Holmes's motions in limine to exclude the introduction of a prior drug conviction . . . ."). The officers assert this same evidence should have been admitted in this civil matter, where Holmes is now the plaintiff and Sharp and Garrett are the defendants.

---

[5]We identify Goldsmith and Dr. Wingo by name because the officers challenge the admission of their testimony.

Pursuant to Federal Rule of Evidence 404(b), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but it "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b); see also Reed v. Malone's Mech., Inc., 765 F.3d 900, 912 (8th Cir. 2014). The officers argue that Holmes put his intent and knowledge at issue when he testified that he knew nothing about the drugs at 5894 Cates Avenue. Holmes's position in this case, they contend, is analogous to a "mere presence" defense—which, in a criminal trial, describes a defendant's assertion that he was merely present at a location where contraband was found but was not aware of the criminal activity. See, e.g., United States v. Turner, 583 F.3d 1062, 1066 (8th Cir. 2009) (describing a "mere presence" defense).

However, this argument neglects to recognize an important distinction between a criminal trial—in which we have said a defendant's mental state is placed "at issue by pleading not guilty to the crime and requiring the government to prove his guilt beyond a reasonable doubt," United States v. Oaks, 606 F.3d 530, 539 (8th Cir. 2010)—and a § 1983 civil trial, where the plaintiff is required to prove that a defendant's conduct violated his civil rights.[6] Holmes had the burden of proving the elements of each claim against each officer, which placed the focus squarely on Garrett's and Sharp's, not Holmes's, conduct. The officers' strongest argument for admissibility is that Holmes's claims rested on the theory that he did not commit the crimes of which he was accused, and that the disputed evidence shows instead that he likely did. But that reasoning supports the admission of this evidence for just the type of propensity purpose that Rule 404(b) prohibits, i.e., to show that because

_____

[6]Our case law on the admissibility of Rule 404(b) evidence in the criminal context, see, e.g., id. at 538–39, is well established, and we cast no doubt on that precedent here.

-7-

Holmes sold drugs in the past, he had the propensity to do so again. And the officers offer no reason why the disputed evidence was relevant to their own conduct.[7] Under these circumstances, we discern no abuse of discretion in the district court's decision to exclude the evidence under Rule 404(b).

The officers assert, in the alternative, that the disputed evidence should have been admitted under Federal Rule of Evidence 608(b).[8] Under this rule, "extrinsic evidence is [generally] not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." But, a court may allow specific instances of conduct to be inquired into on cross-examination "if they are probative of the character for truthfulness or untruthfulness of: (1) the witness; or (2) another witness whose character the witness being cross-examined has testified about." In this case, neither Holmes's prior conviction and purported admission nor the content of Garrett's prior testimony was probative of either person's character for truthfulness (or untruthfulness). The district court did not abuse its discretion.

### b. Testimony of Goldsmith and Dr. Wingo

Hal Goldsmith was the lead prosecutor in the investigation and prosecution of Garrett. Goldsmith told the jury that Garrett had pleaded guilty to several criminal charges in federal court, and explained those charges. The officers assert that this testimony was cumulative, irrelevant, and constituted undisclosed expert testimony. Goldsmith was not permitted to testify about the facts supporting Garrett's guilty

---

[7]As the district court recognized, the officers had absolute immunity from liability based on the testimony they gave in their official capacities at the 2003 criminal trial, see Briscoe v. LaHue, 460 U.S. 325, 326 (1983), so the truthfulness (or untruthfulness) of the officers' prior testimony was not at issue.

[8]Federal Rule of Evidence 609 is not at issue on appeal.

pleas, and Holmes was admonished to keep the questions posed to Goldsmith "narrow." With these limitations, we agree with the district court that Goldsmith did not testify as a legal expert. As to whether the testimony was cumulative and irrelevant, Garrett had already provided the factual description of the conduct underlying his conviction, but Goldsmith helped the jury understand the criminal charges that were filed against Garrett as a result of that conduct. Even assuming that admission of this testimony was error, however, the burden of showing prejudice lies with the officers, see Vasquez, 648 F.3d at 652, and they have demonstrated none.

Regarding Dr. Wingo, the officers first argue that she should not have been certified as an expert on police practices because she is a psychologist, not a law enforcement officer. Dr. Wingo testified that she had experience working with police departments in her capacity as a psychologist, and she trained under both a police psychologist and a retired police captain. Her credentials were presented in both written and testimonial form to the district court, and the officers make no arguments that undermine those qualifications. The district court was well within its discretion to determine that Dr. Wingo was an expert in this field. Cf. Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592–95 (1993).

Second, the officers argue that Dr. Wingo's testimony about best practices was irrelevant—because "police department guidelines do not create a constitutional right," Edwards v. Baer, 863 F.2d 606, 608 (8th Cir. 1988)—and, instead, was nothing more than impermissible speculation and legal conclusion. This is not how we read Dr. Wingo's testimony. It is true that violations of a police department's policies are inadequate on their own to establish a constitutional violation, but it does not necessarily follow that such violations are immaterial to Holmes's claims. Police policies and procedures are put into place to ensure reliability and to protect the integrity of investigations, and whether those practices are followed in a particular case can be relevant evidence. Dr. Wingo testified about professional standards, including the rationales behind certain policies and what consequences might result

from a failure to adhere to them, but she did not offer an assessment of the officers' conduct in this case. Moreover, Holmes relied on circumstantial evidence to show a conspiracy between the officers, and their failures to follow police protocols support inferences Holmes asked the jury to make. The district court effectively monitored the admission of this expert testimony, and did not abuse its discretion in doing so.

## III.

The officers argue that there was insufficient evidence to support the jury's finding of a conspiracy to violate Holmes's civil rights and that they were therefore entitled to judgment as a matter of law after the close of evidence. Individually, Garrett makes the same argument regarding the jury's verdict on the state law claims of malicious prosecution and wrongful imprisonment. "We review the district court's denial of a motion for judgment as a matter of law de novo, 'using the same standards as the district court.'" Luckert v. Dodge Cty., 684 F.3d 808, 816–17 (8th Cir. 2012) (quoting Howard v. Mo. Bone & Joint Ctr., Inc., 615 F.3d 991, 995 (8th Cir. 2010)). However, "[o]ur review of a jury verdict is extremely deferential and we will not reverse for insufficient evidence unless after viewing the evidence in the light most favorable to the verdict, we conclude that no reasonable juror would have returned a verdict for the non-moving party." Morse v. S. Union Co., 174 F.3d 917, 922 (8th Cir. 1999) (quotation omitted).

### a. Conspiracy

"To prove a § 1983 conspiracy claim, [the plaintiff] must prove: (1) that the defendants conspired with others to deprive him of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured him." Bonenberger v. St. Louis. Metro. Police Dep't, 810 F.3d 1103, 1109 (8th Cir. 2016) (cleaned up). In this case, the

officers challenge Holmes's proof of the first element: the agreement or conspiracy to violate his constitutional rights.

"[T]he plaintiff must allege with particularity and specifically demonstrate with material facts that the defendants reached an agreement." Id. However, "[t]he plaintiff can satisfy this burden by pointing to at least some facts [that] would suggest the defendants reached an understanding to violate his rights." Id. (cleaned up); see also White v. McKinley, 519 F.3d 806, 816 (8th Cir. 2008). "[T]he question of the existence of a conspiracy to deprive the plaintiff of his constitutional rights should not be taken from the jury if there is a possibility the jury could infer from the circumstances a 'meeting of the minds' or understanding among the conspirators to achieve the conspiracy's aims." Bonenberger, 810 F.3d at 1109 (cleaned up).

Here, the officers allege that "the only evidence linking Garrett to Holmes's 2003 arrest was that Garrett operated the car for Sharp and Alan Ray when they conducted surveillance; that Garrett was outside the house when Holmes was arrested"; that Garrett was mentioned in the police report; "and that Garrett had Holmes sign a 'money disclaimer' form, truthfully stating that the money recovered from the house did not belong to Holmes." Without Garrett, the argument goes, there can be no "concerted activity" to support a conspiracy.

But the officers overlook additional evidence, including that Garrett and Sharp had a pre-existing working relationship; that Garrett did not merely drive the car but also participated in the surveillance; that Garrett was present at the meeting to plan the search prior to Holmes's arrest; and that Garrett and Sharp had also engaged in misconduct in other cases. In addition, both Garrett and Sharp were impeached with various inaccuracies and inconsistencies at trial, and the jury was entitled to discredit their testimony and draw inferences about their motives for testifying in the way that they did. The officers rely on Reasonover v. St. Louis Cty., 447 F.3d 569 (8th Cir. 2006), where we said that the plaintiff had "present[ed] no specific material facts,

-11-

circumstantial or otherwise, that the officers formed an agreement to violate [plaintiff's] constitutional rights." Id. at 582; see also Livers v. Schenck, 700 F.3d 340, 361–62 (8th Cir. 2012) (explaining that mere joint pursuit of a criminal investigation is not enough to constitute an unlawful conspiracy; there must be evidence "of concerted activity toward an unlawful objective" (quotation omitted)). The case against the officers may not have been overwhelming. But here, unlike Reasonover, the jury heard sufficient evidence to support an inference that Garrett and Sharp reached an agreement to violate Holmes's constitutional rights.

### b. State Claims

False imprisonment and malicious prosecution are separate claims with distinct elements under Missouri state law. See Highfill v. Hale, 186 S.W.3d 277, 280 (Mo. banc 2006) (false imprisonment); Burnett v. Griffith, 769 S.W.2d 780, 783–84, 784 n.2 (Mo. banc 1989) (malicious prosecution). But Garrett's challenge to the denial of judgment as a matter of law on both claims comes down to the same question: Was there sufficient evidence to conclude that he "instigated" the arrest (false imprisonment) and prosecution (malicious prosecution) of Holmes? Under Missouri law, "[i]nstigation requires proof that the defendant stimulated, promoted or encouraged the specific action taken." Burnett, 769 S.W.2d at 784; see Highfill, 186 S.W.3d at 280 ("A person can be liable for false imprisonment if he encourages, causes, promotes, or instigates the arrest."). "Mere passive knowledge of or acquiescence in the acts of another is not sufficient." Burnett, 769 S.W.2d at 784.

The same evidence that allowed a reasonable jury to infer that the officers had conspired to violate Holmes's constitutional rights also supports an inference that Garrett engaged in conduct that "instigated" both Holmes's arrest and his prosecution. Garrett was present for the hour-long surveillance and the pre-arrest meeting to discuss searching 5894 Cates Avenue. Garrett was also outside the home at the time of the arrest, and he was familiar with Holmes from a prior encounter. And, after

-12-

Holmes was brought down to the station, Garrett spoke to him and convinced him to sign the "money disclaimer" form. As with the conspiracy claims, the evidence may not be overwhelming, but it is sufficient to support the jury's verdicts.

## IV.

The officers challenge three jury instructions. We review such challenges for abuse of discretion. Swipies v. Kofka, 419 F.3d 709, 716 (8th Cir. 2005). "The touchstone of our review is whether the instructions, taken as a whole, fairly and adequately represent the evidence and applicable law in light of the issues presented to the jury in a particular case." Id. (quotation omitted). "Reversal for a new trial is appropriate only if there was an error that affected a substantial right of the moving party." Id.

First, the officers object to the following jury instruction:

> The elements of a conspiracy are rarely established through direct evidence and may be proved through circumstantial evidence. It is not necessary for the Plaintiff to show that each participant knew the exact limits of the illegal plan or that a conspirator approved of or participated in a co-conspirator's specific actions in furtherance of the conspiracy. It is enough that the co-conspirator understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do his or her part to further them.

The officers argue generally that this instruction "suggested that a lowered burden of proof applied to Holmes's conspiracy claims," and that it contradicted the district court's earlier instruction on direct and circumstantial evidence. But this instruction is drawn directly from this court's precedents, and is a correct statement of the law. See White, 519 F.3d at 816; see also Dean v. Cty. of Gage, 807 F.3d 931, 939 (8th Cir. 2015) (quoting White v. Smith, 696 F.3d 740, 757 (8th Cir. 2012)). And contrary to the officers' assertion otherwise, the instruction provided additional guidance for

-13-

evaluating different types of evidence in the context of a conspiracy claim, and did not tell the jury to "look for" circumstantial evidence in particular. We see no error in the district court's decision to include this instruction.

Next, the officers challenge the instruction on malicious prosecution. The district court used the Missouri Approved Instruction (MAI) for that claim, as required by Missouri state law. See Clark v. Mo. & N. Ark. R.R. Co., 157 S.W.3d 665, 671 (Mo. Ct. App. 2004). There is no MAI, however, that defines the word "instigate," which the district court deemed necessary to complete the instructions. The district court therefore followed the practice in Missouri of giving a non-MAI instruction that was "simple, brief, impartial, [and] free from argument." Johnson v. Auto Handling Corp., 523 S.W.3d 452, 463 (Mo. banc 2017) (quoting Mo. R. Civ. P. 70.02(b)). The district court's definition of "instigate"—"to stimulate into action, including any actions that aid, promote, or encourage the prosecution"—met these criteria and followed Missouri case law. See Crow v. Crawford & Co., 259 S.W.3d 104, 114–15 (Mo. Ct. App. 2008) ("To instigate means to stimulate or goad to an action, especially a bad action; and that one of its synonyms is abet, which means, in law, to aid promote, or encourage . . . ." (cleaned up)).

Finally, the officers object to the district court's instruction allowing the jury to award damages for both past and "reasonably likely" future damages. They rely on Zoeller v. Terminal R.R. Ass'n of St. Louis, 407 S.W.2d 73, 78 (Mo. Ct. App. 1966), which required "that before a recovery may be allowed for future pain and suffering there should be competent medical findings and the unsupported subjective statements of the injured party are not sufficient." Holmes's therapist, who had diagnosed him with PTSD as a result of his incarceration, testified at trial. Holmes's testimony then confirmed that the medical condition was ongoing and likely to continue into the future. This is permissible under Missouri law. See Foltz v. Burlington N. R.R. Co., 689 S.W.2d 710, 718 (Mo. Ct. App. 1985) ("Evidence of the long continuance of conditions existing at trial is sufficient to justify the instruction

-14-

[on future damages], and the evidence may come solely from the plaintiff with medical corroboration.”).

## V.

We affirm.

_____